

# Disorderly (mis)Conduct:

# The Problem with "Contempt of Cop" Arrests

## By Christy E. Lopez

## June 2010

All expressions of opinion are those of the author or authors.
The American Constitution Society (ACS) takes no position on specific legal or policy initiatives.

American Constitution Society | 1333 H Street, NW, 11th Floor | Washington, DC 20005

# Disorderly (mis)Conduct:  The Problem with "Contempt of Cop" Arrests

## Christy E. Lopez [*]

I.      Introduction and Background

In July 2009, Harvard University professor Henry Louis Gates, Jr., was arrested by Cambridge Police Department Sergeant James Crowley.  The Sergeant went to the Professor's home because a 911 caller had reported a possible burglary in progress.  Gates was concerned by Crowley from the outset because Crowley greeted Gates by asking him to step outside.  Gates was further nonplussed by Crowley's continued questioning of him even after seeing Gates's driver's license, which showed that he did in fact live in the house.[1]  Sergeant Crowley wrote in his arrest report that Professor Gates began to "yell" and that he told Gates that he would speak to him outside, to which Gates responded, "Ya, I'll speak with your mama outside."[2]  Professor Gates has stated that when he stepped outside and asked another police officer for the Sergeant's name, the officer said, "Thank you for accommodating our request.  You are under arrest."[3]

According to Sergeant Crowley's police report, Professor Gates was arrested only after being observed "exhibiting loud and tumultuous behavior, in a public place, directed at a uniformed police officer who was present investigating a report of a crime in progress."  The report continued that "[t]hese actions on the behalf of Gates served no legitimate purpose and caused citizens passing by this location to stop and take notice while appearing surprised and alarmed."  Crowley further asserted that Gates had accused Crowley of being a racist; made a telephone call and appeared to be asking for the "chief"; and told Crowley that he "had no idea who [he] was 'messing' with."  Sergeant Crowley stated in his report that "[d]ue to the tumultuous manner Gates had exhibited in his residence as well as his continued tumultuous behavior outside the residence, in view of the public, I warned Gates that he was becoming disorderly."  Crowley stated that Gates "continued to yell, which drew the attention of both the police officers and citizens, who appeared surprised and alarmed by Gates's outburst."  Crowley asserted that he warned Gates again and then arrested him.[4]  Gates was handcuffed, taken to the police station, booked, and held for several hours.[5]

President Obama famously commented that the police acted "stupidly" in arresting Professor Gates.[6]  The union representing Cambridge police sergeants and lieutenants released a statement in support of Sergeant Crowley, asserting that the Sergeant's actions were "consistent

---

[*] Christy E. Lopez is a civil rights attorney with a practice focusing on police and criminal justice reform.  She is a former Senior Trial Attorney in the U.S. Department of Justice Civil Rights Division and recently completed a seven-year term as court-appointed monitor of the Oakland (California) Police Department.
[1] Dayo Olopade, *Skip Gates Speaks: The Root's Editor-in-Chief Henry Louis Gates Jr. talks about his arrest and the outrage of racial profiling in America*, THE ROOT, July 21, 2009, http://www.theroot.com/views/skip-gates-speaks.
[2] *See* CAMBRIDGE POLICE DEPARTMENT, INCIDENT REPORT #9005127 (2009) *available at* http://i.cdn.turner.com/cnn/2009/images/07/23/0498.001.pdf.
[3] Olopade, *supra* note 1.
[4] *See* CAMBRIDGE POLICE DEPARTMENT, *supra* note 2.
[5] Olopade, *supra* note 1.
[6] Nicholas Graham, *Obama on Skip Gates Arrest: Police Acted "Stupidly,"* THE HUFFINGTON POST, July 22, 2009, http://www.huffingtonpost.com/2009/07/22/obama-on-skip-gates-arres_n_243250.html.

with his training, with the informed policies and practices of the Department, and with applicable legal standards."[7]

Sergeant Crowley's decision to arrest Professor Gates may or may not have been stupid. It may or may not have been consistent with Cambridge Police Department policy. But, if the facts are as Crowley asserted in his arrest report, the arrest was unlawful. Nothing in Sergeant Crowley's report, or any other evidence, suggests that Professor Gates's "tumultuous" behavior went beyond words, and there is no evidence that these words, however loud, rude, or obnoxious were so inflammatory as to inflict injury or tend to incite an immediate breach of the peace. Professor Gates's behavior, as described by Sergeant Crowley, falls squarely in the realm of speech protected by the First Amendment. Not surprisingly, the City of Cambridge and the Cambridge Police Department jointly recommended to the Middlesex County District Attorney that the criminal charges against Professor Gates be dropped, and they were.[8]

Despite its illegality, the arrest of Professor Gates was not unusual. This scenario – an individual being arrested after responding obstreperously to perceived police misconduct – is one that plays out routinely across the United States, albeit without the Ivy League backdrop or culminating in conflict-resolution-through-beer. And while Gates's arrest may have fostered greater understanding between the Professor and the Sergeant,[9] it does not appear that this "teachable moment" went much further. Since the arrest in Cambridge nearly a year ago, there have been few examples of progress in how local legislatures write "disorderly conduct" and similar laws; how police policy incorporates these laws; how law enforcement officers are trained to enforce these statutes; or how these types of arrests are tracked or monitored. Not surprisingly, instances of troubling arrests for "disorderly conduct" and similar infractions continue to abound. Given the entrenched and hyperbolic views expressed during the Gates incident, it is perhaps unsurprising that it did not bring about the sea change some had hoped. This missed opportunity is unfortunate. Change in this area is needed and of vital importance.

There is widespread misunderstanding of police authority to arrest individuals who passively or verbally defy them. There is abundant evidence that police overuse disorderly conduct and similar statutes to arrest people who "disrespect" them or express disagreement with their actions. These abusive arrests cause direct and significant harm to those arrested and, more generally, undermine the appropriate balance between police authority and individual prerogative to question the exercise of that authority. Moreover, setting aside the question of whether any bias motivated Sergeant Crowley's decision to arrest Professor Gates, these types of arrests appear to impact communities of color disproportionately and exacerbate tensions

---

[7] Jonathan Saltzman & Erica Noonan, *Officer in Gates case says he won't apologize*, BOSTON GLOBE, July 22, 2009.
[8] David E. Frank, *Making legal sense of the Gates arrest*, THE DOCKET, July 22, 2009, http://blogs.masslawyersweekly.com/news/2009/07/22/making-legal-sense-of-the-gates-arrest. It would be easy to dismiss Cambridge's decision as motivated solely by political expediency, and certainly even meritorious arrests are not always pursued by prosecutors. In this case, however, there is no legitimate dispute that dropping the charges was the only legally sound resolution to the matter. *See Id.*
[9] Sgt. Crowley and Professor Gates met at the White House "beer summit" and reportedly met again at a bar a few months later. *See, e.g.*, Associated Press, *Cop, scholar to meet again after Obama chat: Two men at the center of race uproar meet at White House for beer*, MSNBC.COM, July 31, 2009, http://www.msnbc.msn.com/id/32210408/ns/politics-white_house; Mara Gay, *The Gates-Crowley Beer Summit, Round 2*, THE ATLANTIC WIRE, Oct. 29, 2009, http://www.theatlanticwire.com/opinions/view/opinion/The-Gates-Crowley-Beer-Summit-Round-2-1441.

between these communities and law enforcement. This might just be another sad fact of police-community relations in a country where poverty and its attendant crime are too often correlated with race, except that it is entirely avoidable. There is no need for police to arrest people for "contempt of cop" and there are ways to ensure that they do not.

This Issue Brief first sets out the law governing the enforcement of disorderly conduct and similar statutes. It then explores the widespread and egregious violations of this law in some law enforcement agencies and by some officers. The issue brief argues that the harm caused by improper arrests and threats of arrest for disorderly conduct far outweighs the justification given by some police and pundits for the aggressive (overly-aggressive, some would say) use of these statutes. Finally, the Issue Brief offers a roadmap for legislators, advocates, law enforcement officials, and others seeking to address this problem.

II.     The Law on Disorderly Conduct and Similar Arrests

The First Amendment generally prohibits law enforcement officials from arresting people for how they talk to (or yell at) the police. Even speech that is loud, disrespectful, profane, and insulting is protected in most circumstances. Only words that by their "very utterance inflict injury or tend to incite an immediate breach of the peace" are unprotected.[10] Use of these so called "fighting words" removes First Amendment protection, whether the speech is directed at a police officer or at a civilian. However, "fighting words" are construed more narrowly when the words are directed at police officers.[11]

Most of us have considerable respect for police officers and appreciate the dangerous and too-often thankless job they undertake every day. Why then would we allow people to say obnoxious and even profane things to police officers? There are several reasons. First, objectionable speech directed towards law enforcement is frequently a critique of police action, however inartfully expressed, and the individual's right to criticize government action is at the very heart of the purpose of the First Amendment's speech protections. As the Supreme Court stated in *City of Houston v. Hill*, perhaps the seminal opinion in this area: "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[12] Secondly, we are less worried about the negative consequences of angry speech in this context because we expect more from police officers than we do from the average citizen: "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'"[13] Speech keeps the wheels of democracy running smoothly, and the right of the individual to speak out directly, openly, and immediately against a government actor doing something the speaker thinks is wrong is perhaps the purest – and messiest – form of this democratic axel-grease we allow.

The Supreme Court and numerous lower courts have recognized the potential for abuse by law enforcement if arrests for disorderly and disrespectful speech are allowed. In *Lewis v. City of New Orleans*, Justice Powell noted in a concurrence at least two forms of potential abuse.

---

[10] Gooding v. Wilson, 405 U.S. 518, 522 (1972) (quoting Chaplinksy v. New Hampshire, 315 U.S. 568, 572 (1942)).
[11] Lewis v. City of New Orleans, 415 U.S. 130, 135 (1974) (Powell, J. concurring).
[12] City of Houston v. Hill, 482 U.S. 451, 462-63 (1987).
[13] *Lewis*, 415 U.S. at 135 (quoting Lewis v. City of New Orleans, 408 U.S. 913 (1972) (Powell, J., concurring)).

First, an ordinance prohibiting obscene or opprobrious language directed towards a police officer "confers on police a virtually unrestrained power to arrest and charge persons with a violation." He recognized that "[m]any arrests are made in 'one-on-one' situations where the only witnesses are the arresting officer and the person charged. All that is required for conviction is that the court accept the testimony of the officer that obscene or opprobrious language had been used toward him while in performance of his duties."[14] In other words, Justice Powell seems to be saying, even if we would rather people express their displeasure with police action with words that are neither obscene nor opprobrious, making it unlawful to do so in effect gives the police the ability to arrest anyone at anytime for a minor infraction with no evidence other than the officer's word.

Justice Powell noted a second problem with allowing arrests for obnoxious speech towards an officer: in arrests for "common street crimes (i.e., robbery, assault, disorderly conduct, resisting arrest), it is usually unnecessary that the person also be charged with the less serious offense of addressing obscene words to the officer. The present type of ordinance tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person. The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident."[15] The concern Justice Powell expresses here is that especially where an officer cannot show that a person *did* something wrong, the officer might arrest the person for *saying* something wrong, simply because the officer *believes* person did something wrong or is just a bad person. Similarly, overly broad criminal statutes invite "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure,"[16] and criminal statutes based on the content of the speech facilitate "[t]he eternal temptation . . . to arrest the speaker rather than to correct the conditions about which he complains."[17]

As discussed below, each of these concerns have repeatedly been borne out in police-civilian interactions, resulting in overbroad statutes being invalidated, and arrests being overturned where the arrest appeared predicated on the exercise of protected speech or critique of the exercise of police authority. The colloquial term for abusive arrests under disorderly conduct and similar statutes is "contempt of cop." The term is a play on the phrase "contempt of court," in which a person is punished for interfering with a court's ability to administer justice, usually by refusing to obey a court's order to do anything from paying a fine to remaining quiet. In contempt of cop arrests, the individual is arrested for showing "contempt" towards a law enforcement officer, either by the way they speak to the officer or by refusing to do what the officer tells them to, or simply because the person is behaving legally but in a way the officer does not like. As the term will be used in this paper, contempt of cop arrests are by definition abusive: they are arrests made with no valid legal reason. When looking at contempt of cop arrests, we may sometimes agree with the officer that the behavior was deplorable, repugnant, and/or immoral, but find that this does not make the behavior an arrestable offense. Other times,

---

[14] *Id.*
[15] *Id.* at 136.
[16] Papachristou v. City of Jacksonville, 405 U.S. 156, 170 (1972) (quoting Thornhill v. Alabama, 310 U.S. 88, 97-98 (1940)) (invalidating the vagrancy ordinance). *See also* Coates v. Cincinnati, 402 U.S. 611, 615-16 (1971) (prohibiting "annoying" conduct is an "obvious invitation to discriminatory enforcement").
[17] Younger v. Harris, 401 U.S. 37, 65 (1971) (Douglas, J., dissenting).

we may find that the behavior was justified and even admirable – perhaps where someone speaks out in an attempt to prevent an officer from using too much force against someone else.

Closely related to contempt of cop arrests are arrests that this paper will refer to as "cover" arrests. A cover arrest, as the phrase will be used here, is an arrest meant to help justify or explain an officer's use of force or other exercise of authority where there may have been no legitimate justification for that exercise of authority. A recent case, discussed below, involving the arrest of a University of Maryland student for assault on an officer and disorderly conduct, appears to be an example of this. In that case, video obtained after the arrest seems to show that there was no disorderly conduct or assault on the officer but that the student was beaten without cause and that the arrest report falsely asserts that the student's injuries resulted from the student's assault on officers and their horses. There are a handful of statutes or ordinances that are known for their use as the predicate for contempt of cop or cover arrests. These laws generally prohibit acts such as: disorderly conduct; refusing to obey an officer; obstructing or delaying an officer; resisting arrest; and battery/assault on an officer. Of course, although many arrests made under these statutes may be abusive, there are good reasons for these statutes, provided they are not facially overbroad. This paper is concerned only with the abusive contempt of cop and cover arrests made under these statutes.

III.    Prevalence of Abusive Enforcement of Disorderly Conduct-Type Laws

Despite the legal prohibition against arresting persons for criticizing police conduct or behaving rudely towards a police officer, such arrests persist. Lawsuits, investigative reports, anecdotal evidence, and a growing collection of YouTube videos, make clear that there is an overuse of police authority to arrest people for disorderly conduct-type offences, including arrests as retaliation against those who have "disrespected" the police or complained about their actions. Moreover, when disorderly conduct-type statutes are used as the basis for arrest, there is considerable evidence that they are used disproportionately against persons of color, and no benign explanation for this disparate enforcement has been borne out. Abusive enforcement of these laws may be more prevalent in some law enforcement agencies than others, but the extent of the problem or the variance of its occurrence rate among agencies is currently unknown because many abusive arrests go undetected, and because no broad systemic study or comparison of contempt of cop or cover arrests has been conducted. Despite the uncertainty, there is more than enough data to indicate that the problem is significant: the reviews and analyses that have been done show misuse and overuse of disorderly conduct-type laws in jurisdictions large and small across the United States.

In Seattle, Washington, a 2008 investigation by the *Post-Intelligencer* found that prosecutors had dropped nearly half of all cases in which the sole charge was "obstructing a public officer."[18] The news investigation found also that half of all such arrests were of African Americans, even though Seattle is predominately white. This disparate arrest rate had resulted in nearly 2% of Seattle's black male population being arrested for the sole charge of obstruction,

---

[18] Stand alone arrests for violations such as "obstruction" and "resisting" are generally of greater concern for the reason Justice Powell stated in his *Lewis* concurrence: "The present type of ordinance tends to be invoked only where there is no other valid basis for arresting an objectionable or suspicious person." *Lewis*, 415 U.S. at 136. Where obstruction, resisting, or the like is the sole basis of the arrest the question becomes: What was the legal justification for the officer taking the action that led to the alleged obstruction or resisting?

and meant that African-Americans were eight times more likely than whites to be arrested for the sole crime of obstructing.[19]  Seattle's civilian police auditor had warned previously that some officers were "abusing their discretion" when making obstruction arrests.  The auditor reported that these scenarios often began with "verbal criticism of the officers, frequently followed by an order to back off or leave the area," then escalated to an obstruction arrests.[20]

In 2009, after the *Post-Intelligencer* series, the auditor conducted another review of obstruction arrests.  The follow-up report generally found improvement but it also reported patterns in arrests for obstruction that appear problematic and are consistent with problems seen in other jurisdictions. The auditor found that some arrests occurred where "officers were dispatched to a fight or disturbance on a bus, outside a bar or at a mission.  These cases often involved a group event and uncertainty about who was a suspect."[21]  In other words, this seems to say, officers arrested individuals even though they were uncertain whether the person had actually committed a crime.  In other instances, officers arrested someone for "obstruction" when the person ran or walked away quickly after being ordered by the officer to stop, even though the officer had no apparent reasonable suspicion that would justify a detention.[22]

A newspaper investigation in 2008 found that the San Jose, California, Police Department makes "public intoxication" and "disturbing the peace" arrests at significantly higher rates than any other major California city, and arrests more people for "resisting arrest" when no more serious crime is involved than all but one much larger city in California.[23]  The newspaper also reports that 70% of the 206 cases in which resisting arrest or delaying or obstructing an officer was the most serious charge, officers used force.[24]  This raises the question of whether this charge is being used as a "cover charge" to help officers justify their decisions to use force. Subsequent to these news reports, community groups in San Jose obtained arrest records for a small portion of public intoxication arrests and assert that in one half of the cases, the arrest reports did not document sufficient probable cause for arrest.[25]  A federal lawsuit was filed against the police department by three individuals who say they were wrongly arrested for public intoxication.  One of the plaintiffs in that suit, a news anchorman, asserts that he was arrested for attempting to record what he believed to be misconduct.  Another said he was arrested after he

---

[19] Eric Nalder et al., *Blacks are arrested on 'contempt of cop' charge at higher rate,* SEATTLE POST-INTELLIGENCER, Feb. 28, 2008.  This review of six years of data treated an obstructing arrest as "stand-alone," "if that was the only charge or if all other charges were for closely related offenses, such as resisting arrest."  *Id.*

[20] *Id.*

[21] OFFICE OF PROFESSIONAL ACCOUNTABILITY, AUDITOR'S REPORT ON OBSTRUCTION ARRESTS JANUARY 2006-JULY 2008 8 (2008), http://www.seattle.gov/police/OPA/docs/Auditor_Obstruction.pdf.

[22] *Id.* at 12-13.  The auditor also found that "[r]acial disparity in arrests remains an issue of concern," but did not conduct any analysis regarding racial disparities in obstruction arrests or make any recommendations because of a broader Seattle project that was reviewing the relationship between Seattle's police department and communities of color.  *Id.* at 3.

[23] Sean Webby, *Policing in San Jose: strict enforcement of 'conduct crimes'; are Latinos targeted?*, THE MERCURY NEWS, Apr. 4, 2009 [hereinafter *Policing in San Jose*]; Sean Webby, *Drunkenness arrests in San Jose outpace other California cities*, THE MERCURY NEWS, Oct. 18, 2008 [hereinafter *Drunkenness arrests in San Jose*] (noting that San Jose's public intoxication law "requires no sobriety test and leaves officers with wide discretion about when to make an arrest").

[24] Sean Webby, *San Jose police often use force in resisting-arrest cases*, THE MERCURY NEWS, Oct. 31, 2009.

[25] Letter from Skyler Porras, ACLU of N. Cal., San Jose Office, et al., to Thomas Perez, Assistant Att'y Gen., Civil Rights Div. (Nov. 4, 2009) [hereinafter ACLU letter].

flipped off an officer who threatened him for not walking away quickly enough. Charges against both men were dropped after they took the unusual step of fighting their arrest charges.[26]

The newspaper investigation also found a troubling ethnic disparity in San Jose arrests. Seventy percent of arrests for disturbing the peace, 57% of arrests for resisting, and 57% of arrests for public intoxication were of Latinos, even though this group comprises only approximately 30% of San Jose residents.[27] The Mayor of San Jose asserted that the ethnic disparity in public intoxication arrests was a "socioeconomic" problem that was reflected in other crime statistics.[28] This assertion does not sit well with the fact that, in California overall, Latinos make up about 36% of the population and constitute about 37% of those charged for public intoxication, and that in Sacramento and San Diego, two other large California cities with similar Latino populations, Latinos are arrested for public intoxication at rates slightly less than their representation in the municipal population.[29] Since these concerns have been made public, arrest rates have dropped in San Jose. Community groups report that they remain concerned that this decrease is only temporary and does not address the underlying causes of the disparity.[30] In November 2009, a group of over a dozen community organizations in San Jose requested that the U.S. Department of Justice investigate the Police Department because of these arrest trends.[31]

In 2006, the NAACP and the ACLU jointly filed a class-action lawsuit against the City of Baltimore and the Baltimore Police Department, alleging a widespread practice of illegal arrests for non-criminal conduct. The plaintiffs included a young man "loitering" by tying his shoe in front of a friend's house; an architect arrested with his friend after showing concern for what appeared to them to be an incident of police brutality; a neurobiologist who was arrested after stopping on a street to watch a woman being handcuffed; two individuals arrested while allegedly legally distributing religious pamphlets; and an individual walking with friends to a basketball game.[32] The parties are negotiating an agreement that is expected to require the police department to make systemic changes in how it documents and tracks disorderly conduct-type arrests. The allegations in the lawsuit are consistent with the findings of a 2009 local media review of police department charging documents. This review found that over a several month period in 2009, prosecutors declined to prosecute 21% of arrests made – over 6,000 – which was a 10% increase over the previous year. In the "dozens" of cases for which records were obtained and reviewed by the news agency, more than 98% of the people arrested but not charged were black.[33]

---

[26] *Drunkenness arrests in San Jose*, *supra* note 23.

[27] *Policing in San Jose*, *supra* note 23.

[28] *Drunkenness arrests in San Jose*, *supra* note 23.

[29] *Id.*

[30] ACLU Letter, *supra* note 25.

[31] *Id.*

[32] Press Release, ACLU, New Plaintiffs Join ACLU Illegal Arrests Lawsuit, Call on City Police to Finally End Unconstitutional Practices (Dec. 18, 2007), *available at* http://www.aclu.org/free-speech/new-plaintiffs-join-aclu-illegal-arrests-lawsuit-call-city-police-finally-end-unconstitu.

[33] Stephen Janis, *Improbable cause: Increase in "no charge arrests raises questions*, INVESTIGATIVE VOICE, Oct. 6, 2009, http://www.investigativevoice.com/index.php?option=com_content&view=article&id=1313:improbable-cause-increase-in-qno-chargeq-arrests-raises-questions&catid=25:the-project&Itemid=44.

In 2003, the District of Columbia's Citizen Complaint Review Board,[34] which provides independent oversight of the Metropolitan Police Department (MPD), reviewed disorderly conduct arrests by MPD officers. The review was prompted by a discovery by the Board's Office of Citizen Complaint Review that a high percentage of complaints against the police department involved disorderly conduct arrests, and that in all four of the disorderly conduct complaints that the Board had adjudicated, it had found that the facts did not justify the arrest. According to the report, "[t]he officer either did not understand or ignored the law regarding disorderly conduct in each of these situations, and appeared to be retaliating against the citizen for his behavior during the encounter with the officer."[35] The Board reviewed arrest statistics for the year 2000 and found that MPD had made *10,600* disorderly conduct arrests during that year, accounting for more than one in five arrests that year and by far the largest category of arrests.[36] The report documented a series of disorderly conduct arrests that appeared abusive as well as MPD procedures that afforded little review of disorderly conduct arrests. Each of the above reviews was completed in whole or substantial part prior to the Gates incident, demonstrating that the focus on the issue of conduct-related arrests is not simply a reaction to that incident. This is a policing issue about which communities have long been concerned.

Some apparent contempt of cop or cover arrests have been captured on video. These recordings provide an instructive glimpse of the type of behavior associated with such arrests and, by comparison to an officer's written documentation of the incident, of how facts are sometimes twisted, or even fabricated, to support the arrest and accompanying force.

In March 2010, for example, two college students at the University of Maryland were arrested by Prince George's County Police for disorderly conduct and assault on an officer following a college basketball game.[37] Both students were charged with disorderly conduct and second-degree assault on an officer. The charge of assaulting an officer, a common contempt of cop charge, carries with it the possibility of ten years imprisonment. Charging documents sworn out by a county officer alleged that the two students were "running and screaming" in the street, causing an unruly crowd to form; that the students struck mounted officers and their horses, causing minor injuries; and that the students suffered minor injuries when kicked by the horses.[38]

Over a month after the arrest, a video of the incident became public.[39] The video appears to contradict the sworn statement in the charging document. It shows one of the students skipping or dancing down the sidewalk and stopping when he reached mounted police. Standing several feet from the horse and appearing to back away as he reaches out towards the horse with

[34] In January 2005, the Citizen Complaint Review Board and the Office of Citizen Complaint Review were renamed the Police Complaints Board and the Office of Police Complaints, respectively.
[35] OFFICE OF CITIZEN COMPLAINT REVIEW, DISORDERLY CONDUCT ARRESTS MADE BY METROPOLITAN POLICE DEPARTMENT OFFICERS, REPORT AND RECOMMENDATIONS 3 (2003), *available at* http://newsroom.dc.gov/file.aspx/release/7250/disorderly_conduct_policy_recommendation.pdf.
[36] *Id.*
[37] Darren Botelho, *At least two students plan to fight riot charges*, THE DIAMONDBACK, Mar. 26, 2010, http://www.diamondbackonline.com/news/at-least-two-students-plan-to-fight-riot-charges-1.1282395.
[38] Ruben Castaneda, *Beating of University of Maryland student by police probed by county prosecutors*, WASH. POST, Apr. 13, 2010, at A1.
[39] Video: Officers strike student after U-Md. basketball game (*The Washington Post* posting Apr. 12, 2010), http://www.washingtonpost.com/wp-dyn/content/video/2010/04/12/VI2010041202595.html?sid=ST2010041204523.

empty hands, the student was rushed by three officers who slammed him against a wall. Two of the officers hit him with their batons. After he was on the ground, apparently not moving, the officers continued to strike him with batons at least a dozen times. The student suffered a concussion and other injuries, including a head wound that needed eight staples to close.[40] The video does not show the other student despite the charging documents' claim that the two students were acting together. The charging documents do not mention the use of force and it appears that officers did not document their use of force in accordance with department policy.

Charges against both students were dropped after the students hired a lawyer and a private investigator found the video recording. The police chief has said that he is "outraged and disappointed" after viewing the video. At the time of this writing, the incident is being investigated both administratively by the department and criminally by county prosecutors and the FBI.[41] The gulf between the officers' statements made in the charging documents filed against these students and the events as depicted on the video raises the question of how many arrests for disorderly conduct, assault on an officer, or similar charges here or elsewhere, might be proven meritless if defendants in other instances had the means to hire a lawyer and a private investigator, and the good fortune of locating a stranger who had videotaped the events.

Another incident captured on video shows an apparent contempt of cop and cover arrest with such clarity that one might mistake it for a police training video.[42] The video shows a San Francisco Police Department officer about to issue citations to several skateboarders for illegally skateboarding. In response to the officer's question, one skateboarder says he is holding his head in his hands because he is angry. The officer asks why he is angry and the skateboarder responds that it is because the officer is being a "fucking dick." The officer responds by immediately crossing the street and arresting him, saying, "now I'm going to act like a fucking dick. You're under arrest for skateboarding in the City and County of San Francisco." Without first asking the skateboarder to submit to handcuffs, the officer twists the skateboarder's arm behind his back, causing the skateboarder to complain about the pain. Despite the apparent lack of even minor resistance by the skateboarder, the officer then states, "Resist again and I am going to break your arm like a twig and then you can treat me like the asshole you think I am. When I am here to cut you a break you need to keep your mouth shut and you need to listen."

The officer then addresses the skateboarder's friends: "Say goodbye to your friend. He wants to be a jackass so he can go to jail." The officer notes that he'll be taking the skateboard for safekeeping but that the skateboarder will "probably" get it back in three weeks. After a gap, the video resumes with the officer stating that "now it has to be documented" so all the skateboarders will be cited. When the skateboarders ask why they are being cited, the officer responds, "Thank her!" pointing to an off-screen female voice. The woman says, "I have nothing to do with this. I watched you not perform your job correctly." The officer repeats, "Thank her!" The woman and another off-screen passerby are heard complaining that the officer kicked the handcuffed skateboarder into the back of the officer's squad car. The officer responds that he was not kicking the skateboarder and that the skateboarder was refusing to get into the vehicle and that he is going to "book him for [resisting arrest] as well, do you want that?"

---

[40] Ruben Castaneda, *FBI probes Pr. George's County police in U-Md. beating*, WASH. POST, Apr. 14, 2010.
[41] *Id.*
[42] Justin Berton, *S.F. skateboarder vs. SFPD officer*, SFGATE, Sept. 30, 2009, http://www.sfgate.com/cgi-bin/blogs/crime/detail?blogid=144&entry_id=48696.

The officer cogently explains a widely-held police perspective: the frustration at being seen as the "bad guy" after responding to a citizen complaint about illegal activity and responding to resolve the matter. The passerby responds, "When you kick people, you're bad guys!" The officer disputes that he kicked the skateboarder, stating that "I put my foot on his hip 'cause he refused to get in." "Yeah!" responds the passerby, "that's what I used to tell my mom too when I kicked my little brother." This video is somewhat unique in that it captures both a contempt of cop arrest and the issuance of cover citations, and because the officer provides an unusually direct preview of his motivations and how he can be expected to modify the facts to justify the arrest, uses of force, and citations. The officer's "business as usual" attitude indicates that escalating an incident in response to feeling "disrespected" might not be unusual for this officer or for others officers with whom he has trained and worked.

Nor does it appear unusual for skateboarders to record their interactions with the police. In a video taken in Baltimore's Inner Harbor, a Baltimore police officer is shown becoming enraged at a 14-year-old skateboarder who calls the officer "dude" and is otherwise arguably disrespectful. The officer puts the boy in a headlock, pushing him to the ground and threatening to "smack" him "upside the head" for the boy's "attitude." The officer shouts at the boy: "When I'm talking to you, you shut your mouth and you listen. Obviously your parents don't put a foot in your butt quite enough, because you don't understand the meaning of respect."[43] In response to this incident, the police department put a different lieutenant and sergeant in command of the unit patrolling the Inner Harbor and provided "sensitivity training" to the officers in this unit.[44] The police department also sustained administrative charges against the officer for using excessive force and "discourtesy."[45] This disciplinary action failed to impress the skateboarder's mother who observed, "If I were to go to my job and I were to get upset with someone who called me dude three times and tackled [them], I'd be terminated immediately."[46]

These videos and others like them provide vivid demonstration that, in contrast to the Supreme Court's expectation expressed in *Houston v. Hill* that officers would be more likely to show restraint in the face of perceived disrespect, some officers appear to show too little restraint in such circumstances. Some officers respond to perceived disrespect or challenges to their actions with unwarranted intimidation and force, abusing the authority conferred by their badge and acting as if impunity is a component of that authority. While law enforcement officers deserve to be treated with respect, some officers appear not to understand that a lack of respect does not warrant a use of force or an arrest and serves only to decrease respect for the profession.

IV.    Harm Caused by "Contempt of Cop" and "Cover" Arrests

The discussion above demonstrates that, despite the legal prohibition, the problem of contempt of cop and cover arrests persists. The prevalence of the problem, and the apparent acceptance by many of contempt of cop arrests, as the Gates incident clearly showed, raises the question of whether the harm caused by such arrests is appreciated. For some, the harm caused

---

[43] Video: Baltimore Police Officer Salvatore Rivieri and skateboarder (YouTube posting Feb. 13, 2008), http://www.youtube.com/watch?v=OPEeCYPGjm0.
[44] Annie Linskey, *Police shift Inner Harbor patrol command*, BALT. SUN, Apr. 23, 2008.
[45] Peter Hermann, *Skateboard Clip's Lesson Fuzzy*, BALT. SUN, Sept. 27, 2009.
[46] *Officer Suspended After Skateboarder Rant*, GOOD MORNING AMERICA, Feb. 13, 2008, http://abcnews.go.com/GMA/story?id=4282823&page=1.

by these abusive arrests is obvious: lives turned upside down by an arrest or being subjected to unwarranted force and intimidation by a police officer; police exercising a level of control that is at odds with a democratic society. For others, arresting for contempt of cop is appropriate and even necessary if police officers are to retain the level of respect and authority needed to keep order in an increasingly disorderly and disrespectful world. It is worth briefly discussing some of these ideas to explain the extent of the harm caused by contempt of cop and cover arrests and why such arrests are not only unnecessary but also run counter to effective law enforcement.

A. The Harm to Those Arrested

There is sometimes a misimpression that, for the individual arrested, an arrest for disorderly conduct, resisting arrest, or similar infraction will mean nothing more than a night in jail and maybe one more line on the criminal record of someone who already has a lengthy criminal record. While this may be true in some instances, it often is not, and in any event does not negate the harm done by an illegal arrest. Abusive contempt of cop and cover arrests is a policing issue that can have a long-term negative impact on large swaths of some communities, including a significant number of people who are not criminals or dangerous to the community.[47]

As noted in one federal suit on behalf of a man who was falsely arrested by police, the "unseen injury" of a false arrest, even where little jail time results, is that a "promising young man must from now on answer 'yes' whenever a potential employer inquires whether he has ever been arrested."[48] Moreover, even one night in jail is a significant harm, and for many persons arrested on abusive contempt of cop and cover charges, there is the potential for a more extensive sentence. Particularly where there is no video to exonerate the individual or the individual has neither the resources nor reputation to put on an effective defense, the wrongly arrested individual may plead to or be convicted by a jury on the false charges that lead to considerable time in jail or prison. In addition to the immediate harm of incarceration itself, an arrest record or conviction can have significant deleterious effects on one's future ability to get or keep a job,[49] go to school,[50] get credit, or rent an apartment, not to mention the impact on one's reputation. The indications that improper contempt of cop arrests disproportionately impact communities of color means that these communities, portions of which already have higher rates of unemployment, homelessness, and incarceration, may have these ills disproportionately exacerbated by this type of misconduct.

---

[47] This author is aware of no analysis or data collection that would establish, on any systematic, broad-based level, the rate of various outcomes for persons arrested for contempt of cop violations, or the criminal backgrounds, if any, of those individuals. Data related to the rate of non-prosecution for arrests under laws known to be used for contempt of cop arrests, as well as anecdotal evidence, does provide evidence that these types of arrests cause more than de minimis harm. This is one of many areas of policing in which additional study would assist public-policy decision making.

[48] Eric Nalder, *Seattle to pay for unlawful arrest, excessive force*, SEATTLE POST-INTELLIGENCER, May 20, 2008; *see also* Eric Nalder, *Dubious bust leaves "unseen injury" for life: Even when charges are dropped, arrest record is still there,* SEATTLE POST-INTELLIGENCER, Feb. 27, 2008.

[49] *Policing in San Jose*, *supra* note 23 (reporting that a woman lost her job as a result of her conviction for obstructing and resisting during a protest).

[50] Sean Webby, *San Jose: DA won't charge cops in videotaped beating*, THE MERCURY NEWS, Mar. 3, 2010 (reporting student's relief when resisting arrest and brandishing a deadly weapon charges dropped, allowing him to continue studying in U.S.).

B.     Undermining a Critical Check on the Exercise of Police Power

The ability to oppose or challenge police action is not only, as Justice Brennan stated,[51] a principal characteristic distinguishing a free nation from a police state; it is one of the central benefits of living in a free nation.  In a city, county, state, or country where people are unable or afraid to challenge a governmental exercise of its authority to use force, put someone behind bars, or impact a person's ability to make a living, find a home, or become educated, an important check on government behavior is lost.  Without this check, a tendency for government actors to abuse their authority may develop and a greater number of people will be wrongfully arrested.  There is little doubt that contempt of cop and cover arrests can serve to chill civilian attempts to complain about or challenge police behavior, and evidence that they are often intended to do just that.  Examples of abusive arrests and uses of force specifically against those who question or attempt to document police behavior abound.  Many of the arrests discussed above are such examples.  And there are many more.  In a review by a New Mexico newspaper of arrests by Albuquerque police officers for "refusing to obey," the Albuquerque Journal found that arrests for this violation included a man who would not let officers, who did not have a warrant, into his home, along with a TV cameraman who was covering a police standoff.[52]  In Severn, Maryland, a man was threatened with arrest until he deleted every photograph he had taken of an accident scene and then left the scene as ordered by police.[53]  In Pittsburgh, a man was charged with violating the Pennsylvania Wiretap Act and "possession of an instrument of crime" (his cell phone) after he used his cell phone to record the arrest of a friend.[54]

Complaints from family members that they are arrested when they complain about an abusive arrest or the force used against a relative are common.  In Baltimore, Maryland, a seven-year-old boy was arrested for sitting on a dirt bike, allegedly as retaliation for a police misconduct complaint filed by his mother.[55]  In Seattle, the civilian police auditor found that nearly a third of the obstruction arrests reviewed involved the "interference" by an individual with the arrest or investigation of someone else, what the report calls the "bystander problem."  The report notes that, "[t]he bystander arrested for obstruction is often a friend or relative who wants to take control of a suspect or prevent his being taken into custody."  In some cases, the individual simply "refuses to leave the area."[56]  As these and other arrests show, while contempt of cop and cover arrests may sometimes simply be an officer's response to perceived disrespect, they are sometimes meant to discourage observing, documenting, or challenging officer conduct.

---

[51] *Hill*, 482 U.S. at 463.

[52] T.J. Wilham, *N.M. cops can't arrest for "refusing to obey*," ALBUQUERQUE JOURNAL, Nov. 25, 2008.

[53] Marc Shapiro, *Severn man says police forced him to delete photos*, MARYLAND GAZETTE, Nov. 4, 2009.

[54] Press Release, ACLU, ACLU Files Suit on Behalf of Pittsburgh Man Arrested for Taping Police (Aug. 13, 2009), *available at* http://www.aclupa.org/pressroom/aclufilessuitonbehalfofpit.htm.  In March 2010, the judge granted in part the defendant's Motion to Dismiss.  *See* Matheny v. County of Allegheny, No. 2:09-cv-01070-CB, 2010 WL 1007859 (W.D. Pa. Mar. 16, 2010).

[55] A police detective testified that his supervisor told him that if the boy's mother carried through on her threat to complain about the detective's earlier decision to confiscate the dirt bike, the supervisor would order the detective to lock up the boy.  Justin Fenton, *Officers who arrested 7-year-old say they followed procedures: Defendants in family's lawsuit deny retaliating against mother*, BALT. SUN, Jan. 14, 2010.

[56] OFFICE OF PROFESSIONAL ACCOUNTABILITY, *supra* note 21, at 12.

C.      Damage to the Police-Community Relationships Necessary for Effective Crime Fighting

Police departments need community support to effectively deter crime.  Community members who trust the police are more likely to report corner drug dealing, the sighting of a dangerous suspect, and even knowledge about a crime being planned.  When a community sees police officers abuse their authority – and experiences or observes the direct harm of that abuse – that trust is undermined and the relationship between police and the communities they work for suffers.  As one neighbor said during a meeting with police leadership that followed the apparently abusive arrest of a community leader, "When you arrest a person standing on his stoop for no reason, it's hard to rebuild that relationship."  Community members distributed t-shirts at this meeting that said, "21223, I live here, respect me."[57]  These sentiments are not uncommon among law abiding citizens – especially those living in areas beset with crime.

Perhaps unfairly but understandably, even law enforcement officers who have never made a contempt of cop or cover arrest are painted with the same brush by community members who were subjected to, witnessed, or even merely heard of abusive police actions, simply because the officer wears the same badge and uniform as those officers who have abused their authority.  The level of mistrust, stereotyping, and anger – on both sides – increases, making it more difficult for police officers to safely and effectively protect communities.  If, as it appears, contempt of cop and cover arrests occur more frequently in communities of color, this poisoning in the police-community relationship is occurring in the communities that are often most in need of effective policing.  Contempt of cop and cover arrests thus have a far-reaching impact, throughout these communities and beyond.

D.      The Drain on Resources

Contempt of cop and cover arrests are costly.  They needlessly consume resources that could be used by the police department in more productive and constructive ways, or by the state or local governmental jurisdiction that often ends up paying the price of an officer's misconduct when a lawsuit is filed.  Resources are diverted from other law enforcement functions to process the arrests of hundreds, sometimes thousands, of individuals, only to have the charges dropped.  In some jurisdictions, the sheer number of disorderly conduct and similar arrests that are not prosecuted suggests that if abusive arrests were reduced, cost savings and more efficient policing would result.  In Washington, D.C., for example, the Metropolitan Police Department made 10,600 disorderly conduct arrests in one year, accounting for more than one in five arrests.[58]  As discussed above, a review by the city's Citizen Complaint Review Board indicated what appeared to be a pattern of abuse in some of these arrests.  In Baltimore, Maryland, in 2008, there were 9,983 arrests that did not lead to charges after prosecutors declined to prosecute the

---

[57] Stephen Janis, *We Can't Take This Anymore: In meeting with top police brass, community demands change,* INVESTIGATIVE VOICE, Dec. 17, 2009,
http://www.investigativevoice.com/index.php?option=com_content&view=article&id=1926:we-cant-take-this-anymoreq-community-seeks-change-in-meeting-with-top-police-brass&catid=25:the-project&Itemid=44.
[58] OFFICE OF CITIZEN COMPLAINT REVIEW, *supra* note 35.

cases.[59] Many of these arrests were for violations such as loitering, trespassing, and drinking a beer – arrests that a federal lawsuit alleges show a pattern of abuse.[60]

Abusive arrests sometimes result in civil suits or even criminal prosecutions that can absorb an extraordinary amount of time and money to defend and settle. In March 2010, the Prince George's County police settled for $125,000 a lawsuit by a man who was falsely charged with two counts of assault, including a punch with a closed fist into the stomach of one officer. The officers' in-car camera showed that the man never hit the police and was in fact hit several times in the head by an officer with the officer's baton.[61] In Seattle, a federal civil jury found police liable for $268,000 in damages, as well as attorneys' fees, for falsely arresting and using force against a man charged with obstruction and resisting arrest, despite no serious injuries to the man.[62] In 2009, Pittsburgh paid $50,000 to settle a claim by a man who was issued a citation for giving the finger to a police officer.[63] These are just a few of the examples among dozens that can be gleaned from recent media reports.

## V.      Reducing or Eliminating Contempt of Cop and Cover Arrests

If we agree that contempt of cop and cover arrests are a destructive and costly harm, the question then is whether we can do anything to reduce or eliminate such arrests. The answer is yes, but fixing this problem is not simple: it requires a concerted and multi-faceted effort. Fortunately, this effort is consistent with overarching law enforcement objectives and community concerns.

### A.      Modify Law and Policy Where Necessary

Generally, abusive contempt of cop and cover arrests occur despite police policies and local and state laws and ordinances that appropriately disallow such arrests. In some instances though, local law may need to be brought up to date or modified to ensure it facilitates adherence to the Constitution; or police policy may need to be modified so that it comports with law. In Washington, D.C., there is currently a citywide task force on disorderly conduct that is considering how to revise the city's nearly century-old laws related to breach of peace. This task force includes representatives from the Metropolitan Police Department (MPD) and the Office of the Attorney General, as well as from the Office of Police Complaints and other agencies, working together to ensure that local laws do not encourage contempt of cop arrests.[64] MPD has already issued a directive incorporating changes recommended by CCRB into its internal

---

[59] Janis, *supra* note 33.

[60] Press Release, *supra* note 32. Through July 2009, the rate was even higher, with 6,313 people arrested and released without charge. Janis, *supra* note 33.

[61] Ruben Castaneda, *Prince George's to pay man who accused police of assault*, WASH. POST, Mar. 12, 2010.

[62] Nalder, *supra* note 48.

[63] Torsten Ove, *City to pay $50,000 for citation issued over obscene gesture*, PITTSBURGH POST-GAZETTE, Nov. 25, 2009. *See Bird Flipping IS Constitutionally Protected Speech*, N. COUNTRY GAZETTE, Mar. 6, 2010 (discussing other cases in which police agencies have paid substantial sums in payouts or defending arrests for conduct that was later deemed protected speech).

[64] Telephone Interview with Iveliesse Cruz, Deputy Director, Office of Police Complaints (Jan. 5, 2010); OFFICE OF CITIZEN COMPLAINT REVIEW, *supra* note 35 (discussing age and need for reform of the City's disturbances of the public peace related codes and statutes).

procedure for disorderly conduct arrests.[65]  In other instances, where officers have misinterpreted surveillance or privacy laws, state or local legislatures may need to clarify statutes to ensure they are not used as the basis for arresting people for legitimately exercising their First Amendment rights, or for audio or video recording public police conduct.[66]

At times, internal police policy may need similar clarification.  In Albuquerque, after a news investigation found that of 517 arrests for "refusing to obey" made by the Albuquerque Police Department in 2007, 70% were thrown out, the chief issued a revised policy that prohibits officers from arresting someone for "refusing to obey" unless the individual is being arrested for another crime or is physically keeping the officer from carrying out his or her duties.[67]  In Seattle, the police department's legal advisor issued a bulletin, "Tips for Avoiding Civil Liability."  Among the tips:  "Don't arrest for 'contempt of cop.'  Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact.  Flunking the 'attitude test' is not a bookable offense."  Additionally, the tips suggest: "Avoid charging for 'obstructing' and 'resisting arrest.'  Experience has shown that a substantial number of these two charges in combination result in the dismissal of criminal charges and subsequent filing of civil complaints."  The tips further recommend:  "Don't be intimated by complaint [sic] of others, including off-duty employers, into making an arrest.  Arrest officers must make the arrest decision and are responsible for the arrest decision they make."[68]

B.      Change Police Culture

If abusive arrests are occurring routinely in a law enforcement agency, or if contempt of cop or cover arrests are not viewed as abusive by the rank and file, stopping such arrests will require more than a reiteration of policy.  It will require a change in the agency's culture.  Changing police culture is sometimes viewed as an amorphous and elusive goal.  While changing police culture can be quite difficult in some agencies, there are a number of concrete measures that can change culture and help an agency reduce contempt of cop and cover arrests.

1.      Leadership

The most important factor in creating a culture that does not tolerate contempt of cop or cover arrests is leadership.  The leader of the agency, usually the chief, commissioner, or sheriff, creates and enforces the expectation that abusive arrests will not occur.  Leadership sends this message in a variety of ways, and a memo on the chief's letterhead is never sufficient.  Perhaps the most important facet of this leadership is whether leadership models the right behavior.  Whether the chief follows the rule of law (and agency policy) in running the department will be watched closely.  Who the chief hires and promotes are other critical signals of the type of behavior that is sought after and rewarded.  A formal policy sternly warning against improper

---

[65] OFFICE OF POLICE COMPLAINTS 2006 ANN. REP. 39.  The CCRB report recommended that MPD revise its arrest procedure to ensure that individuals arrested for disorderly conduct better understand the potential consequences of arrest and that this understanding is better documented.  OFFICE OF CITIZEN COMPLAINT REVIEW, *supra* note 35, at 20.

[66] *See, e.g.*, Alexandra Andrews, *In Mass., Recording an Arrest May Get You Arrested*, PRO PUBLICA, Jan. 12, 2010, http://www.propublica.org/article/in-mass.-recording-an-arrest-may-get-you-arrested-112.

[67] Wilham, *supra* note 52.  The new policy also prohibits arrests for verbal challenges unless they constitute threatening "fighting words."  *Id.*

[68] Leo Port, *Tips for Avoiding Civil Liability Lawsuits*, SEATTLE POST-INTELLIGENCER, Feb. 27, 2008.

obstruction or disorderly conduct arrests will have little impact if officers see those who routinely violate the policy being promoted and given choice assignments.

## 2. Training

We know that one of the keys to ensuring that officers properly exercise their authority is educating them about why this is important, and helping them develop the necessary skill sets to do their jobs lawfully and effectively. In the aftermath of the Gates incident, there were widely divergent responses from law enforcement officers regarding both the Gates arrest specifically and disorderly conduct arrests more generally.[69] Some officers clearly understood when to show restraint when faced with disrespect and taunts: according to one retired New York City police officer "What's the reason for staying, if the anger's directed at me? If it's directed at a third party, a storekeeper, I stay." The officer went on to tell the reporter that if the officer himself is the provocation, the officer should leave.[70] Another officer, who said he was trained not to lose his temper or risk his job by reacting to name calling, was able to quote for the reporter exactly when the line is crossed and an arrest is warranted.[71] A mounted police officer with the Los Angeles Police Department said that taking verbal abuse is part of the job and that "if you don't have a tough skin, then you shouldn't be a cop."[72]

Interestingly, most of the officers who advocated a more aggressive approach to verbally abusive individuals, including a quicker resort to arrest, often expressed their concern in terms of safety, sometimes coupled with a healthy ego. Michael J. Palladine, president of the Detectives Endowment Association in New York told the New York Times: "We pay these officers to risk their lives every day. We're taught that officers should have a thicker skin and be a little immune to some comments. But not to the point where you are abused in public. You don't get paid to be publicly abused. There are laws that protect against that."[73] Another New York officer said that if a crowd is gathering an officer cannot "back down" or it might come back to haunt another officer later.[74] A police officer from Denver was quoted as saying, "We're not going to take abuse. We have to remain in control. We're running the show."[75]

These sentiments, which are consistent with others expressed after the Gates incident, suggest that ending a culture of contempt of cop arrests requires that training for officers take a two-pronged approach. First, training should include a component that educates officers that, despite what they may have been told or come to believe, such arrests are neither legal nor conducive to effective crime control, officer safety, or respect for the profession. Officers need to be taught that, contrary to the belief of some, the law says that your job *does* require that you take verbal abuse sometimes and that, for the most part, people can legally document what you

---

[69] *See, e.g.*, Michael Wilson & Solomon Moore, *As Officers Face Heated Words, Their Tactics Vary,* N.Y. TIMES, Jul. 25, 2009; Bonnie Rochman, *The Gates Case: When Disorderly Conduct Is a Cop's Judgment Call*, TIME, Jul. 25, 2009.
[70] *See* Wilson, *supra* note 69; *see also* In re: W.H.L., 743 A.2d 1226, 1226 (D.C. 2000) (distinguishing between conduct directed at the police and conduct directed towards the police); OFFICE OF CITIZEN COMPLAINT REVIEW, *supra* note 35, at 5.
[71] *See, e.g.*, Wilson, *supra* note 69.
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*

do when interacting with the public. Secondly, and perhaps even more importantly, training must also ensure that officers are taught the specific tactics and skills for properly responding to obstreperous individuals. Officers need to be taught how to protect their own safety and the safety of their fellow officers, as well as how to convey the authority they need to effectively do their jobs, in the face of a rude or irate individual. Officers need to be taught what they should do to de-escalate a situation in which the officer has initially overreacted out of anger or fear, and how to prevent it from recurring. Some officers have never learned how to effectively and legally control these situations, but others have and are very good at it. A department should identify *these* officers and incorporate them into their training program.

3.      Supervision, Data Collection, Tracking, and Response

Law enforcement agencies have a number of other tools at their disposal that can help create a culture where contempt of cop and cover arrests are rare. As with all officer conduct, first level supervisors (usually sergeants) play a critical role in preventing abusive arrests. Arrest reports and use of force reports usually require approval from a supervisor. Supervisors thus have the ability in most circumstances to ask questions and fill in gaps to ensure that the arrest and force were proper, and to immediately address situations where it appears that the police conduct was improper. Supervisors with the right values, skills, and knowledge of their officers can also help their agencies identify early on officers who resort to contempt of cop and cover arrests, provide them with remedial training, and pair them with officers who know how to better handle such situations.

In some agencies, especially large ones, tracking disorderly conduct, resisting, and similar arrests through an early warning system, and regularly evaluating and responding to this data, can help supervisors better do their jobs and assist commanders in knowing which supervisors have a better handle on this issue. The value of tracking these types of arrests is increasingly being recognized.[76] Many federal settlement agreements requiring reforms in police departments alleged to have a pattern or practice of misconduct have required the agency to more closely supervise, track, and respond to the types of arrests most likely to be misused.[77]

---

[76] *See, e.g.*, Webby, *supra* note 24. The article notes that many departments now closely monitor resisting arrest cases and quotes Gerald Chaleff, police administrator for the Los Angeles Police Department: "I think such reviews are a best practice now." *Id.*

[77] *See, e.g.*., Consent Decree at 6-12, United States v. City of Los Angeles et al., No. 00-11769 (C.D. Cal. Jul. 7, 2009) ("Supervisors shall evaluate each incident in which a person is charged with interfering with a police officer (California Penal Code § 148), resisting arrest, or assault on an officer to determine whether it raises any issue or concern regarding training, policy, or tactics"); Memorandum of Agreement (MOU) Between the U.S. Dep't of Justice and Prince George's County Md. et al., 18 (Jan. 22, 2004), *available at* http://www.justice.gov/crt/split/documents/pgpd/pg_memo_agree.pdf (requiring that an Early Identification System established pursuant to the MOU track "all instances in which force is used and a subject is charged with 'resisting arrest,' 'assault on a police officer,' 'disorderly conduct,' or 'obstruction of justice'"); Negotiated Settlement Agreement at 16, Delphine Allen, et al. v. City of Oakland, et al., No. 00-4599 (N.D. Cal. Jan. 22, 2003) (requiring that supervisors respond to the scene of arrest for arrests pursuant to California Penal Code §§ 69 (resisting/deterring an officer), 148 (interfering with a police officer), and 243(b)(c) (battery on a police officer)), and at 30 (requiring that early warning system established pursuant to the Settlement Agreement track and require intervention for any officer who has exceeded a certain number of these arrests during a specified time period); Consent Judgment Use of Force and Arrest and Witness Detention at 24, United States v. City of Detroit, et al., No. 03-72558 (E.D. Mich. Jun. 12, 2003) (requiring that a risk management database created under the agreement track "all instances in which

### 4. Documenting Officer Interactions

Documenting officer interactions with civilians can be an extraordinarily effective tool for stopping abusive arrests. In-car video systems, audio recorders carried in the pockets of officers and their supervisors, and civilians recording interactions on cell phones or camcorders are different ways of helping a police agency, and, where appropriate, the public, determine what actually happened. These tools can also help teach officers and civilians how to act – and not to act. While the law is still catching up to the benefits of this emerging technology, law enforcement is beginning to move beyond its initial opposition to in-car video systems and similar documentation efforts as they realize that, in most instances, such documentation vindicates the officer. At the same time, as discussed, audio and video recording of an incident sometimes is the only way to reveal that the officer's description of events, sometimes supported by other officers' statements and written up in a sworn document, is not accurate. This assists the law enforcement agency, and other community stakeholders, in determining the extent and nature of the problem – a necessary precursor to effectively addressing the issue.

The Seattle Police Department legal advisor has told officers to assume they are being recorded at all times.[78] This admonition, if taken to heart, might have an impact: in at least one agency of which this author is aware, a department placed in-car cameras in the vehicles of officers who had received a disproportionate number of complaints over a several-month-long period. During the time the officers were in cars with cameras, they received no complaints.

### 5. Accountability

If, despite the message from leadership, good training, and appropriate supervision, an officer nonetheless arrests someone for contempt of cop or to cover an inappropriate use of force, the officer should be held accountable. Police leaders need to insist on accountability and make it happen even where – perhaps especially where – a portion of the community and most of the agency's officers see nothing wrong with the conduct of the officer. Appropriate and effective accountability may require that an officer be retrained, it may require a period of suspension, or, depending upon the circumstances, it may even require demotion or termination.

Unless accountability is a clear and consistent component of an agency's culture, adherence to the agency's rules and values will not happen. Holding an officer accountable, particularly in circumstances like those that usually surround contempt of cop and cover arrests, is also a critical component of building successful police-community relationships, and can help rebuild those relationships after a particularly high-profile or egregious abusive arrest. Individuals should not be required to hope that a prosecutor drops a case after they have spent a night in jail, spend money to defend themselves, or bring suit against the police department, just to ensure that their constitutional rights are protected.

---

force is used and a subject is charged with 'resisting arrest,' 'assault on a police officer,' 'disorderly conduct,' or 'interfering with a city employee'").

[78] OFFICE OF PROFESSIONAL ACCOUNTABILITY, *supra* note 21, at 12-13.

6. Accepting and Investigating Misconduct Complaints

One of the hallmarks of a police agency with a culture problem is that a lot of misconduct does not get reported or investigated. A lack of reporting may be caused by an agency culture that sets up road blocks to making complaints: offering complaint brochures and forms only in one language; requiring that complaints be made in person or lodged with a supervisor (or sometimes with the officer against whom you are complaining); or requiring that complaints be notarized or made by the person who suffered the misconduct (who may be in jail because of the misconduct), rather than by a third party. Misconduct may not get reported because community members believe it would be fruitless to do so – more likely leading to future retaliation from the police rather than in a fair and full investigation of the officer's conduct. The nature of contempt of cop and cover arrests means that complaints are sometimes the only way an agency will know if one of its officers is making abusive arrests. Improving the complaint process to make it easier and less intimidating, and ensuring that complaints, once lodged, are fully and fairly investigated, allows a police department to better protect the rights of those it serves and helps it detect and respond to problems *before* they become pervasive.

7. Outside Intervention

Where an agency is unable or unwilling to make the changes necessary to stop abusive contempt of cop and cover arrests, outside intervention may be necessary. Where it is part of their purview, elected political leaders may need to replace department leadership. Private plaintiffs or government enforcement agencies at the state or federal level may need to bring suit to effect the necessary change. As noted above, many settlement agreements requiring reforms to police practice include requirements meant to prevent contempt of cop and cover up arrests.

C. Change Community Culture

As the response to the Gates episode demonstrated, a lack of understanding regarding the limits of police authority and the rights of individuals to protest their treatment by police is hardly limited to some members of the law enforcement community. In fact, in many respects the aftermath of the Gates incident showed that some segments of the broader community have a more expansive view of what the police should be allowed to do than many officers do. Even where there was agreement that Sergeant Crowley's treatment of Professor Gates was unnecessary or flat out wrong, there was often the sense among some that Gates deserved to be arrested nonetheless because he was "stupid" enough to protest that treatment.[79]

Community members might look the other way or respond half-heartedly to abusive arrests because they are as frustrated and fed up with public disorder as are the police, and they see contempt of cop arrests as a sort of unfortunate but unavoidable side effect of a police department that is working aggressively to keep the corners clear and the streets safe. We may

---

[79] For a relatively mild and non-profane version of this argument, *see, e.g.*, Lars Hindsley, *Obama Stupid. Officer Stupid. Gates Stupid.*, NEWSVINE, Jul. 23, 2009, http://larshindsley.newsvine.com/_news/2009/07/23/3054714-obama-stupid-officer-stupid-gates-stupid ("[Gates] could just provide the officer I.D. and the incident is avoided, but he invites trouble by getting his tail in the air too by saying, 'this is what happens to a black man in America' and 'you don't know who you're messing with'. [sic] Again, stupid. ANYONE of any color that says that to a police officer is making a stupid mistake.").

even encourage abusive arrests by misinterpreting "community policing" as something that requires police officers to overstep their bounds and stop crimes before they happen. Taken one step too far, this means apprehending people before they've done anything illegal. "Proactive" policing is great, as long as it is not *too* proactive.[80]

To effectively address this issue, we must educate our own communities about the harms of contempt of cop and cover arrests: the impact on the livelihoods and health of those arrested; the distrust such arrests engender among those most necessary to help the police fight crime; the undermining of democratic values and the proper balance of police power and individual autonomy, as well as what that means in concrete terms. We must make sure we are not demanding that police impose their own personal sense of order and morality on a situation and then castigating them when they do. We need to recognize the value of individuals who are willing to object to mistreatment of themselves or others by the police rather than dismiss them as foolish. It is unrealistic and unfair to expect that police culture will stop tolerating contempt of cop and cover arrests unless the broader community is willing to make clear its objection to such arrests as well. Indeed, many police departments are ahead of many segments of the community in recognizing the harm and ineffectiveness of contempt of cop and cover arrests.

## VI.    Conclusion

Inappropriate contempt of cop and cover arrests, and the too-often unnecessary uses of force that accompany these arrests, are a widespread problem. These abusive arrests cause direct harm to those arrested, violate the constitutional rights at the core of our democracy, alienate large segments of our people, and make policing less effective. A meaningful response to this problem requires a number of different approaches, all implemented in concert and to a greater or lesser degree, depending on the breadth and the depth of the problem and the nature of the law enforcement agency in which it is occurring. Changes to policy, and sometimes laws, will be required. Closer supervision, data collection and analysis, and sensible training will also be necessary, as will accountability for officers who make these arrests – and the supervisors who approve them. Where the problem is widespread within an agency, or appears to be a de facto part of agency practice, outside intervention may be required to help the agency make the necessary changes to its culture. Those of us outside the field of law enforcement have a critical role to play: speaking out about misconduct when we see it; teaching others to recognize the many harms of misconduct; and demanding changes in agencies that are not effectively preventing or responding to contempt of cop or cover arrests.

---

[80] *See, e.g.*, OFFICE OF PROFESSIONAL ACCOUNTABILITY, *supra* note 21, at 8 ("There may be a significant increase in obstruction situations where the officers are 'proactive,' as opposed to responsive to 911 calls.").