**In The Matter Of:**

*Lacarsha Gay vs.*

*Cobb County, Georgia, et al.*

---

*OFFICER MATTHEW MADDEN*

*July 17, 2017*

---

*MUELLER REPORTING, LLC*

*Certified Court Reporters*

*P.O. BOX 889187*

*DUNWOODY, GEORGIA 30356*

*(470) 545-8233*

Original File MaddenMatthewOfficer.prn

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LACARSHA GAY,                     *
                                  *
            Plaintiff,            *      CIVIL ACTION FILE
                                  *
vs.                               *      NO. 1:16-CV-2539
                                  *
COBB COUNTY, GEORGIA, COBB        *
COUNTY POLICE DEPT.,              *
OFFICERS M.C. MADDEN and          *
MOORE, and SERGEANT DORSEY,       *
in their individual capacity,     *
                                  *
            Defendants.           *


        The deposition of MATTHEW MADDEN, taken pursuant to

the stipulations contained herein; the reading and signing of

the deposition reserved, before Susan F. Roper, B-1106,

Certified Court Reporter, commencing at 10:21 a.m., on

Monday, July 17, 2017, at 100 Cherokee Street, Suite 350,

Marietta, Georgia.


APPEARANCES:

FOR THE PLAINTIFF:   KENDRICK D. McWILLIAMS, SR., ESQUIRE

FOR THE DEFENDANTS:  EDDIE SNELLING, JR., ESQUIRE

A P P E A R A N C E S

FOR THE PLAINTIFF:

    KENDRICK K. McWILLIAMS, SR., ESQUIRE
    HAGEN, ROSSKOPF & EARLE
    119 North McDonough Street
    Decatur, Georgia   30030
    (404) 522-7553
    kendrick@hagen-law.com


FOR THE DEFENDANTS:

    EDDIE SNELLING, JR., ESQUIRE
    COBB COUNTY ATTORNEY'S OFFICE
    100 Cherokee Street
    Suite 350
    Atlanta, Georgia   30090
    (770) 528-4014
    eddie.snelling@cobbcounty.org

INDEX

WITNESS                                                    PAGE

MATTHEW MADDEN

     Cross-Examination by Mr. McWilliams................ 5

EXHIBITS

BY THE PLAINTIFF:

     Exhibit No. 4 -- Reporting officer narrative........21

     (Originally marked exhibits attached to the original of
the deposition and a copy attached to all copies produced.)

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1                    P R O C E E D I N G S
 2                                        10:21 a.m.
 3           MR. McWILLIAMS:  Go ahead and swear the witness for
 4      me, please.
 5               (Witness sworn by court reporter.)
 6           MR. McWILLIAMS:  Officer Madden, this is going to
 7      be the deposition of Officer Madden, taken in the case
 8      of LaCarsha Gay v. Cobb County, Georgia, Cobb County
 9      Police Department, Officers M.C. Madden and Dorsey and
10      Sergeant -- I'm sorry -- and Moore and Sergeant Dorsey.
11      This case is pending in the Federal District Court for
12      the Northern District of Georgia under Civil Action
13      Number 1:16-CV-2539.  Mr. Madden is here today, or
14      Officer Madden is here today, represented by Mr.
15      Snelling.
16           This deposition is being taken for all purposes
17      permitted under the Federal Civil Practice Act.  I
18      propose that all objections other than those to form of
19      the question and responsiveness of -- responsiveness of
20      the answer be reserved until first use, if that is
21      agreeable?
22           MR. SNELLING:  That's agreeable.
23  Whereupon,
24                       MATTHEW MADDEN
25  was called as a witness herein, and having been first duly
```

OFFICER MATTHEW MADDEN - July 17, 2017

1  sworn, was examined and testified as follows:

2                    CROSS-EXAMINATION

3  BY MR. McWILLIAMS:

4      Q    Officer Madden, as I just said, my name is Kendrick

5  McWilliams and I represent LaCarsha Gay.  I'm going to be

6  here asking some questions today about the incident that

7  forms the basis of this lawsuit.  I'm going to ask some

8  questions and if I ask a question that's confusing, just let

9  me know.  I'll be happy to rephrase the question, okay?  If

10 you give me a response, I'm going to assume you understood

11 the question; is that fair?

12     A    Yes, sir.

13     Q    And we have a court reporter here today.  She's

14 taking everything down and, you know, she can't really take

15 down nods of the head and uh-huh, uh-uh, so if you can give

16 me a verbal response to my questions it'll make it a lot

17 easier for her to take it down and also easier for us when we

18 go back to read this deposition at a later date.

19     A    Yes, sir.

20     Q    Is that fair?

21          If you need to take a break at any time, whether it

22 be for the restroom or to go talk to Mr. Snelling, you're

23 more than welcome to do that.  The only caveat to that is if

24 I have a question pending before you, I'd request that you

25 please respond to the question that I asked before we go off

OFFICER MATTHEW MADDEN - July 17, 2017

1  the record.  Is that fair?

2      A    Yes, sir.

3      Q    All right.  Could you state your full name for the

4  record?

5      A    Matthew Clayton Madden.

6      Q    And what is your date of birth?

7      A    It is 1/18/1989.

8      Q    All right.  And where are you currently employed?

9      A    Lilburn, the City of Lilburn.

10     Q    All right.  And how are you -- what is your job

11 with the City of Lilburn?

12     A    I'm a police officer.

13     Q    Okay.  How long have you been a police officer with

14 the City of Lilburn?

15     A    Since 2014.

16     Q    And before starting your employment with the City

17 of Lilburn, were you employed as a police officer with Cobb

18 County?

19     A    Yes, sir.

20     Q    And when did you start that employment?

21     A    2010.

22     Q    Are you -- with the City of Lilburn, are you a

23 patrolman?

24     A    Yes, sir.

25     Q    Tell me about your highest level of education.

OFFICER MATTHEW MADDEN - July 17, 2017

1      A    I have an associate's degree.

2      Q    From?

3      A    The school?

4      Q    Yes.

5      A    Georgia Perimeter College.

6      Q    Okay.  And you are married?

7      A    Yes, sir.

8      Q    What is your wife's name?

9      A    Amber Madden.

10     Q    Are your job duties with the City of Lilburn any

11  different than your job duties you had when you were working

12  for the Cobb County Police Department?

13     A    Generally speaking, no.

14     Q    And you are POST-certified?

15     A    Yes, sir.

16     Q    When did you complete your -- when did you obtain

17  your POST certification?

18     A    December 2010, I believe.

19     Q    How many years of experience did you have on the

20  job with Cobb County?

21     A    From 2010 to 2014.

22     Q    Okay.  And had you had any law enforcement jobs

23  before working with Cobb County?

24     A    No, sir.

25     Q    Before coming to work for the Cobb County Police

OFFICER MATTHEW MADDEN - July 17, 2017

1  Department, did you work for Atlanta Flooring Design?

2       A    Yes, sir, I did.

3       Q    What did you do for Atlanta Flooring Design?

4       A    A lot of things.

5       Q    Okay.  Tell me about some of them.

6       A    I worked in the warehouse.  I did

7  shipping/receiving.  I did quality control, maintenance work.

8       Q    And you worked that job from -- when did you obtain

9  that job?

10      A    I believe it was 2007.

11      Q    And you worked that job 2007 until 2010, so for

12  three years --

13      A    Yes, sir.

14      Q    -- before joining the Cobb County Police

15  Department?

16      A    That's correct.

17      Q    Okay.  And before Atlanta Flooring Design, you

18  worked for Renz, R-E-N-Z Baseball Academy?

19      A    Yes, sir.

20      Q    What did you do for Renz Baseball Academy?

21      A    I did front desk work, cashier, maintenance,

22  conducted camps and lessons.

23      Q    It says here you left Renz in 2007 after

24  graduating.  Where'd you graduate from?

25      A    I was homeschooled.

OFFICER MATTHEW MADDEN - July 17, 2017

1      Q    Okay.  So after you finished homeschool, you then

2   started your coursework at Georgia Perimeter?

3      A    Yes, sir.

4      Q    All right.  And you graduated Georgia Perimeter in

5   2009; is that right?

6      A    I don't recall.  Sounds close to it.

7      Q    Okay.  Did you obtain an Associate's Degree in

8   Science Criminal Justice?

9      A    Yes, sir.

10     Q    As a police officer with the City of Lilburn, do

11  they allow you all to take side jobs outside of your policing

12  job?

13     A    If it is approved, yes.

14     Q    And who do you have to go through for approval for

15  those jobs?

16     A    Your chain of command.

17     Q    Who is your direct report?  Who do you report

18  directly to?

19     A    My sergeant.

20     Q    Okay.  I should have asked this earlier.  Did you

21  ever serve in the United States Military?

22     A    No, sir, I did not.

23     Q    Okay.  And your sergeant, what is your sergeant's

24  name at the City of Lilburn?

25     A    I've had several.  It changes.  Do you want my

OFFICER MATTHEW MADDEN - July 17, 2017

1  current one?

2      Q    Who's -- yeah, who's your current?

3      A    Sergeant Brian McCann.

4      Q    Okay.  And do you currently work any side jobs or

5  have worked any side jobs in the last six months that have

6  been approved?

7      A    Yes, sir.

8      Q    And where have some of those jobs been?

9      A    One is Nam Dae Mun.  It's a farmer's market in the

10 city of Lilburn.

11     Q    And what did you for Nam Dae Mun?

12     A    Security.

13     Q    What does that security job entail at Nam Dae Mun?

14 I mean are you patrolling inside the premises, the ex-side --

15 the exterior of the premises?

16     A    Both.

17     Q    And when you were doing that, are you in uniform or

18 out of uniform?

19     A    In uniform.

20     Q    And would you consider yourself on duty when you're

21 performing those tasks?

22     A    Yes, sir.

23     Q    Is there any time you are not on duty as a police

24 officer?

25     A    On duty as being get paid to be a police officer,

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1    yes, there's times I don't get paid to --
 2         Q    Okay.
 3         A    -- be a police officer, yes.
 4         Q    But -- but even paid or not paid, are there any
 5    times you're not a police officer?
 6         A    Not really.
 7         Q    Other than the POST certification that you received
 8    to become a police officer for Cobb County, you also went
 9    through some continuing law enforcement training; is that
10    correct?
11         A    Yes, sir.
12         Q    And does that include such things as traffic
13    services, how to investigate traffic accidents?
14         A    I did a basic traffic accident course in mandate.
15         Q    In mandate?
16         A    Yes, sir.
17         Q    Okay.  And that was before you became operational
18    as a police officer with Cobb County?
19         A    That's correct.
20         Q    And accident, so that was the just the basic
21    traffic accident investigation course that you took during
22    mandate?
23         A    Yes, sir.
24         Q    Did you ever get any specific training on
25    responding to domestic calls?
```

OFFICER MATTHEW MADDEN - July 17, 2017

 1      A     In the -- in the academy, I did.

 2      Q     And during the course of that training for domestic

 3   calls, were you made aware of the police guidelines for an

 4   investigation of domestic calls?

 5      A     Yes, sir.

 6      Q     Okay.  And tell me a little bit about what that

 7   entailed as far as how did they instruct you on what the

 8   police procedures and policies were for investigating a

 9   domestic call?

10      A     Repeat the question one more time.

11      Q     I know, it was really long.  Tell me a little bit

12   about what the domestic training that you got for

13   investigating domestic calls.  What did that training entail?

14      A     How we -- when we get dispatched, how we travel

15   there for certain domestic violence calls, when we arrive,

16   what information we need to obtain to write a report.

17      Q     Okay.  And are there specific procedures that you

18   were made aware of with regard to investigating domestic

19   calls?

20      A     What kind of specific --

21      Q     Does Cobb County have police procedures?

22      A     Yes.

23      Q     Okay.  And did you receive a copy of those police

24   procedures?

25      A     Yes, sir, I did.

1    Q    Were you responsible for knowing and understanding

2  the contents of those procedures?

3    A    Yes, sir, I was responsible for knowing them.

4    Q    Okay.  And did -- was there anything, any document

5  or anything you had to sign, attesting that you'd reviewed

6  them and understood them?

7    A    I believe for every policy that Cobb County had

8  that you went over, you had to sign for it.

9    Q    Okay.  And whenever there was a new policy or

10 procedure that -- that came up, how were you made aware of

11 it?

12   A    A memo of some sort, written or e-mailed.

13   Q    And then were you responsible for reviewing that

14 new policy or updated policy?

15   A    Yes, sir.

16   Q    And again, were you responsible for signing off on

17 it?

18   A    Yes, sir, I believe so.

19   Q    Okay.  What's your current work schedule?

20   A    I work 12-hour days.  Would you like me to be --

21 what days I work?

22   Q    Is it a four days on, you know?

23   A    It's --

24   Q    Four on, four off, you know, five-two?

25   A    It's two, two, three, two, two, three.

OFFICER MATTHEW MADDEN - July 17, 2017

1    Q    Okay.  And each time it's a 12-hour shift?

2    A    Yes, sir.

3    Q    Is it ever less than a 12-hour shift?

4    A    Unless you go home sick.

5    Q    Okay.  And during the time you were with Cobb

6  County, what was your work shift like?

7    A    I believe it was five eights.

8    Q    Five eights, okay.  And the areas that you

9  patrolled as a Cobb County police officer, were they

10 consistent each day?

11   A    Generally speaking, I had the same assignment every

12 day.

13   Q    And what assignment did you have at the time of

14 this incident?

15   A    I was uniform --

16   Q    Okay.

17   A    -- precinct three.

18   Q    Precinct three?

19   A    Yes, sir.

20   Q    And did precinct three cover the apartment complex,

21 the Jamestown Apartment complex, where this incident

22 occurred?

23   A    Yes, sir.

24   Q    Okay.  And I -- just to be clear, I'm talking about

25 July 16, 2014.  And that Jamestown Apartment complex, how

OFFICER MATTHEW MADDEN - July 17, 2017

1   many times had you investigated a domestic call at that
2   location?
3        A    Several.
4        Q    Okay.  Had you ever investigated a domestic call at
5   that location with regard to Ms. LaCarsha Gay?
6        A    I don't believe so.  That was the only one.
7        Q    Do you recall the other officers that responded to
8   the call on February 16, 2014?  Do you remember the names of
9   those officers?
10       A    I remember the names of officers.  I do recall a
11  few of them that arrived.
12       Q    Do you remember Officer Moore being there?
13       A    Yes, sir.
14       Q    Do you remember Sergeant Dorsey being there?
15       A    Yes, sir.
16       Q    Officer Wells?
17       A    Yes, sir.
18       Q    And of the three that I just named, were any of
19  those folks also assigned to the same sector that you were or
20  precinct?
21       A    Yes, same precinct.
22       Q    Okay.  All three of those folks?
23       A    No, sir.
24       Q    Who was not assigned?
25       A    Detective Wells was not specifically assigned to a

OFFICER MATTHEW MADDEN - July 17, 2017

1   precinct.

2        Q    And what was Detective Wells' role?

3        A    I don't recall right offhand.

4        Q    And prior to the call that we're here about today

5   on July 16, 2014, how long had you been patrolling that area?

6        A    For the entire time that I've been employed with

7   Cobb County after being POST certified.

8        Q    Okay.  So from 2010 until 2014?

9        A    Yes, sir.

10       Q    That entire time, that roughly four-year span?  And

11  based on your experience, is that immediate area surrounding

12  the complex, was -- was it known for criminal activity?

13       A    Yeah, it had criminal activity.

14       Q    Was the criminal activity in that area out of the

15  ordinary --

16            MR. SNELLING:  Object to the form.

17  BY MR. McWILLIAMS:  (Resuming)

18       Q    -- based on your experience?

19       A    It was all the same for the entire time I worked

20  there.

21       Q    Okay.  So were there any areas in the precinct --

22  in the sector that you patrolled, were there any areas that

23  were more notorious for crime than others?

24            MR. SNELLING:  Object to the form.  You can answer.

25  BY THE WITNESS:

OFFICER MATTHEW MADDEN - July 17, 2017

1       A    Of course.  I mean you're always going to have more
2   criminal places than others.
3       Q    Okay.  And was that apartment complex area known to
4   be one of those places?
5       A    Not more so than anywhere else.
6       Q    Now, other than -- and I know you said you'd never
7   been to that apartment complex on a domestic call for Ms. Gay
8   or Mr. Garcia.  Had you ever investigated any other domestic
9   disturbance at that apartment complex?
10      A    Yes, sir.
11      Q    Do you know how many?
12      A    I don't.
13      Q    Is there any way for you to approximate?  More than
14  five, less than ten?
15      A    Around five probably.
16      Q    Okay.
17      A    Less than ten maybe.
18      Q    Were any of those encounters violent?
19      A    Physically you mean or violent?
20      Q    Well, let's go physical first.  How many of them
21  involved physical violence?
22      A    If it was a -- I don't recall specifically, but
23  there were some that involved physical altercations.
24      Q    Did any of those physical altercations create an
25  unusual risk of harm to any of the police officers that

```
 1   investigated it?
 2              MR. SNELLING:  Object to the form.
 3   BY THE WITNESS:
 4        A    Repeat -- repeat the question.
 5        Q    Okay.  Did -- during those calls that you can
 6   recall, did any of those encounters involve a situation where
 7   the police officers were in any kind of threat for harm to
 8   their lives or to their person?
 9        A    Not that I recall.
10        Q    Other than this encounter, had you ever encountered
11   Ms. Gay in your official capacity as a police officer before
12   for anything, for any other incident?
13        A    Not that I remember.
14        Q    Had you had any encounters with Mr. Garcia in your
15   official capacity as a police officer?
16        A    Not that I remember.
17        Q    Had you ever arrested anyone for disorderly conduct
18   at Ms. Gay's apartment complex before?
19        A    I don't recall.  Prior to her arrest?
20        Q    Yes.
21        A    No, I don't recall.
22        Q    Prior to Ms. Gay's arrest, had you initiated an
23   arrest for disorderly conduct under that same section of the
24   statute that you arrested Ms. Gay for?
25        A    I don't know.
```

OFFICER MATTHEW MADDEN - July 17, 2017

1    Q   When was the last time you looked at your report?

2    A   I don't know, several -- several months ago.

3    Q   Okay.  And when you arrived on the scene, who was

4    the first person you encountered?  First of all, how did you

5    get the call to -- to -- to the Jamestown Village apartments?

6    A   Dispatch.

7    Q   And when the call comes over dispatch, how do you -

8    - how does -- how does an officer decide who's going to go on

9    the call?

10   A   Who's going to go?

11   Q   Yeah, well, who's going to, you know, show up for

12   the call or who's going to be the, you know, actually appear

13   to see what's going on?

14   A   Dispatch will dispatch an officer to the call.

15   Q   So you were specifically dispatched to the call by

16   the -- by dispatch?

17   A   I don't -- I don't know.  It's possible.

18   Q   Okay.  And after you arrived on the scene, were

19   there any other officers present?

20   A   During the time I was on the scene, the officers

21   that you mentioned were there.

22   Q   Well, when you pulled up to the complex, were you

23   the first officer there or was there already someone there?

24   A   I don't remember.

25   Q   And at some point, who was the first officer you

OFFICER MATTHEW MADDEN - July 17, 2017

1  encountered?

2      A    Officer Moore was there the majority of the time.

3  I remember seeing -- knowing that he was there.

4      Q    Who was the first person, member of the general

5  public, that you encountered when you pulled up?

6      A    I believe it was Ms. Gay's daughter.

7      Q    Okay.  And Ms. Gay's daughter, did you all -- how

8  did you know it was Ms. Gay's daughter when you approached

9  her?

10     A    We didn't.

11     Q    So you had an opportunity to talk to the child?

12     A    Yes.  She was -- she appeared distraught, so I

13  figured it had something to do with it.

14     Q    And what did you say to her?

15     A    I don't remember.

16     Q    But you did -- you were able to have a conversation

17  with her?

18     A    Yes.  We were able to speak to her.

19     Q    Okay.  And when you spoke to her, you don't

20  remember what you said?

21     A    Not specifically.

22     Q    Do you remember what she said?

23     A    I don't remember exactly what she said, no.

24     Q    Okay.  Well, I've got a copy of your report here.

25  I'm going to mark this as Plaintiff's 1.

OFFICER MATTHEW MADDEN - July 17, 2017

1          MR. SNELLING:  Can we just go sequentially maybe?
2     It would be four.
3          MR. McWILLIAMS:  Oh, from the previous deposition?
4          MR. SNELLING:  Yes.
5          THE REPORTER:  It's up to you.  I don't care.
6          MR. McWILLIAMS:  Yeah, because it will be less
7     confusing later on.
8          MR. SNELLING:  Much less confusing.
9          MR. McWILLIAMS:  Yeah, let's do that.
10         THE REPORTER:  Although I sometimes won't be the
11    court reporter.  Y'all have to keep up with it.
12         MR. SNELLING:  Oh, I am.
13         THE REPORTER:  Okay.
14                     (Whereupon, Plaintiff's
15                     Exhibit No. 4 was marked
16                     for identification)
17    BY MR. McWILLIAMS:  (Resuming)
18         Q    And you just take a moment and go ahead and just
19    review it and then I'll -- let me see the report.  Are you
20    all done?
21         A    Yes, sir, I read it.
22         Q    Okay.  So you -- you encountered Ms. Gay's daughter
23    when you arrived on the scene; is that correct?
24         A    That's correct.
25         Q    Okay.  And you had a conversation with her; is that

OFFICER MATTHEW MADDEN - July 17, 2017

1   correct?

2       A     That's correct.

3       Q     Do you recall now what the substance of that

4   conversation was after reviewing your report?

5       A     Reading the report, I can tell you what the report

6   says.

7       Q     Okay.  And the report says that you did, in fact,

8   encounter her and you -- Officer Moore asked her what

9   happened and she said daddy did it.  Is that what you wrote

10  in your report?

11      A     For the scratches, that's correct.

12      Q     Okay.  So at the time that you all encountered her

13  initially, you noticed the abrasions on the child's face?

14      A     That's correct.

15      Q     And she told you her daddy did it, okay.

16      A     Uh-huh.

17      Q     When you arrived on the scene after you received

18  the call from dis -- is that -- is that a yes?

19      A     For what?

20      Q     For when you arrived on the -- when you -- when you

21  saw her?

22          THE REPORTER:  Said her daddy did it.  He said --

23          he said uh-huh instead of responding.

24          MR. McWILLIAMS:  Right.  So read the question

25          again.

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1            THE REPORTER:  She told you daddy did it.  Your
 2       response was uh-huh instead of yes or no.
 3   BY THE WITNESS:
 4       A     Yes.
 5       Q     Okay, it's a yes.  So when dispatch sent you to the
 6   location, were you -- did you have the names of any of the
 7   parties involved?
 8       A     On the dispatch it could have said the name, but I
 9   don't know.
10       Q     Okay.  And then you were led to the apartment by
11   Ms. Gay's daughter; is that right?
12       A     That's correct.
13       Q     And Ms. Gay opened the door; is that right?
14       A     Yes.
15       Q     Now, at the time that you all appeared at Ms. Gay's
16   door, she opened the door, was she confrontational with you
17   at that time on the initial encounter?
18       A     Just upon opening the door?
19       Q     Yes.
20       A     No.
21       Q     And how many officers appeared or responded to Ms.
22   Gay's apartment?
23       A     During the incident?
24       Q     Initially, yes.
25       A     Initially, I believe me and Moore were there.
```

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1              MR. SNELLING:  You can refer back to your incident
 2        report.
 3   BY MR. McWILLIAMS:  (Resuming)
 4        Q    Anytime you want.  Sorry.
 5        A    Well, initially, me and Moore were there, but there
 6   was other officers who arrived --
 7        Q    Okay.  But --
 8        A    -- at a late time.
 9        Q    But initially when you approached Ms. Gay,
10   initially at her door, it was just you and Officer Moore; is
11   that right?
12        A    I believe so.
13        Q    Okay.  And who spoke to Ms. Gay?
14        A    I spoke to Ms. Gay.  I don't know if Officer Moore
15   said anything or not.
16        Q    Did you ask -- did you ask her any questions about
17   Mr. Garcia at that time?
18        A    I believe I was trying to get some information
19   about the incident and general information of the parties.
20        Q    Was any information provided to you at that time
21   about Mr. Garcia?
22        A    He left.
23        Q    And that's the only information that you received
24   during your questioning?
25        A    During the initial questioning, yes, that's all I
```

1    received.

2         Q    Did you know or have reason to believe that Mr.

3    Garcia was still in Ms. Gay's residence?

4         A    I didn't know, but it's common practice to believe

5    that another party of a physical altercation is still in the

6    area.

7         Q    Okay.  And at what point did the incident with Ms.

8    Gay begin to escalate?

9              MR. SNELLING:  Object to the form.  You can answer.

10   BY THE WITNESS:

11        A    I believe when we were trying to get some

12   information from the daughter and the daughter walked inside

13   and Ms. Gay didn't want her daughter to talk to us.

14        Q    Now, before her daughter walked inside, had you

15   been provided any information about Mr. Garcia?

16        A    No, other than he left.

17        Q    Okay.  And had you asked her any other questions?

18        A    I don't recall specifically what questions I asked,

19   but it was questions asked.

20        Q    And she responded to those questions?

21        A    I don't -- I don't recall.  She didn't give

22   pertinent information as far as the incident or information

23   in order to conduct a report.

24        Q    What pertinent information did she fail to provide?

25        A    Name, date of birth information to be able to

OFFICER MATTHEW MADDEN - July 17, 2017

1    identify somebody.

2         Q     Okay.  And whose -- whose name were you looking

3    for?

4         A     Anybody involved in the altercation.

5         Q     Okay.  And did she give you Mr. Garcia's name?

6         A     Eventually she did.

7         Q     Okay.  So it's your testimony that, at some point,

8    she gave it to you.  So during that initial questioning, did

9    Ms. Gay provide you with Mr. Garcia's name?

10        A     I don't recall.  I can look over my report.  It

11   says I asked for her information and Mr. Garcia's information

12   and she stated I already gave you that information, which

13   she, in fact, did not.

14        Q     What other information did you need?

15        A     The sequence of events pertaining to the

16   altercation itself.

17        Q     And at the time you were on the location, were you

18   aware of any other witnesses or any other people that may

19   have called 911?

20        A     I believe there was multiple calls to 911.

21        Q     Was one of those calls made to 911 made by Ms. Gay?

22        A     Yes, I believe so.

23        Q     Now, prior to you asking to enter Ms. Gay's

24   residence, was she loud and uncooperative?

25        A     Can you repeat the question?

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1      Q    Prior to you asking to enter Ms. Gay's residence,
 2   was she loud and uncooperative?
 3      A    I don't recall when that was asked or who asked it.
 4      Q    Did you explain to her why you wanted to enter her
 5   residence?
 6      A    I did not.
 7      Q    Did she give you consent to enter her residence?
 8      A    I don't believe so.
 9      Q    Okay.  Did you have a warrant to enter her
10   residence?
11      A    I did not.
12      Q    And at the time, were there any exigent
13   circumstances that existed that would have allowed you to
14   enter her residence?
15      A    Not at the time, no.
16      Q    You've already testified that you were responsible
17   for knowing Cobb County Police Department policies prior --
18   during your mandate courses; is that correct?
19      A    While I was at Cobb County, yes, sir.
20      Q    Yes, while at Cobb County.  So during your time at
21   Cobb County, were you familiar with policy number 5.07, entry
22   into private premises?
23      A    Probably.
24      Q    Okay.  And go ahead -- going to be --
25           MR. SNELLING:  Entry into private residence?
```

OFFICER MATTHEW MADDEN - July 17, 2017

```
1              MR. McWILLIAMS:  Entry into private premises.
2              MR. SNELLING:  Which is already marked as Exhibit
3        3?
4              MR. McWILLIAMS:  Right, which is why I'm not going
5        to mark it again.
6   BY MR. McWILLIAMS:  (Resuming)
7        Q    I just wanted to know -- make sure that you were
8   familiar with it.
9        A    Am I familiar with it or was I notified of it?
10       Q    Yes.  Were you notified of it?
11       A    Yes, sir.
12       Q    And part of being notified of it and signing off is
13  that you were -- had at least read it; is that correct?
14       A    That's correct.
15       Q    Okay.  During the dispatch call, did they mention
16  that narcotics or guns were involved in this domestic
17  dispute?
18       A    Not that I recall.
19       Q    During the course of your initial investigation,
20  were you made aware that narcotics or guns were involved in
21  this domestic dispute?
22       A    Not that I remember.
23       Q    And at some point after Ms. Gay did not provide you
24  access to her home, did she tell you to leave?
25       A    I don't remember.
```

OFFICER MATTHEW MADDEN - July 17, 2017

1     Q    Okay.  Did she threaten anyone at that time?

2     A    She didn't threaten me.

3     Q    Okay.  Did she threaten anyone?

4     A    Not that I remember.

5     Q    Okay.  Was there -- at the time that you were doing

6 the initial investigation and talking to Ms. Gay, did you

7 have probable cause to believe that she committed a crime?

8     A    During what time?

9     Q    The initial investigation when you were talking to

10 Ms. Gay, did you have any probable cause to believe that she

11 committed a crime?

12    A    Not prior to when she started cursing.

13    Q    Okay.  And her cursing was her committing a crime?

14    A    That is correct.

15    Q    But during the initial encounter, she hadn't

16 committed a crime?

17    A    Prior to the cursing.

18    Q    Prior to the escalation.  And that was my other

19 question was is after you asked to gain entry into her home

20 is that when she began cursing?

21    A    Like I said, I don't recall asking for entry into

22 her home.

23    Q    Okay.  At some point, did you put your foot in her

24 door?

25    A    Yes.  I think I -- let's see here.  Yes.

OFFICER MATTHEW MADDEN - July 17, 2017

1       Q.    Okay.  Had she committed a crime before -- at the
2    time that you decided to put your foot in her door?
3       A     Not that I knew of.
4       Q     And would you consider the action of putting your
5    foot in her door seizing her?
6       A     Not her specifically, no.
7       Q     Okay.  But she certainly wasn't free to go; is that
8    -- is that true or a fair statement?
9       A     I think more or less her daughter was not free to
10   go.
11      Q     Okay.  But the daughter was in her premises; is
12   that right?
13      A     Yes, at the time.
14      Q     Okay.  And your foot was in the door and she
15   couldn't close the door, so Ms. Gay was not free to go as
16   well; is that -- is that a fair statement?
17      A     Sure.
18      Q     At any time during the encounter with Ms. Gay, did
19   you -- were you fearful for your own safety?
20      A     I don't believe so.
21      Q     Did Officer Moore express any concern for his
22   safety?
23      A     Not that I recall.
24      Q     Did Ms. Gay threaten you?  I know you said she was
25   cursing, but did she physically threaten you?

OFFICER MATTHEW MADDEN - July 17, 2017

1    A    Not that I remember.

2    Q    And at the time, who made the decision to arrest

3  Ms. Gay?

4    A    I did.

5    Q    And where was Ms. Gay when you made the decision to

6  arrest her?

7    A    In the threshold of her doorway.

8    Q    Okay.  And was the door open or closed?

9    A    It was open.

10   Q    So at some point after your foot was in the door,

11  she had opened her door?  You put --

12   A    She opened --

13   Q    You put your foot in the door; is that right?

14   A    Yes.

15   Q    And she was prevented from closing the door; is

16  that right?

17        MR. SNELLING:  Asked and answered.

18  BY MR. McWILLIAMS:  (Resuming)

19   Q    I'm trying to get through the sequence.

20   A    Did she attempt to close the door?

21   Q    Correct.

22   A    No, she did not.

23   Q    Okay.  So when you put your foot in the door, she

24  did not attempt to close the door?

25   A    Not that I recall.

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1       Q     So you were still able to engage Ms. Gay?

 2       A     That's correct.

 3       Q     And it was your decision to -- to arrest Ms. Gay;

 4  is that correct?

 5       A     That is correct.

 6       Q     And what was she originally -- initially arrested

 7  for?

 8       A     Disorderly conduct.

 9       Q     And what were the grounds of the -- or the basis of

10  that arrest and that charge?

11       A     Probable cause.

12       Q     Yes.  Probable cause for what?

13       A     Disorderly conduct.

14       Q     Okay.  So your probable cause for the arrest was --

15  was that she was being disorderly?

16       A     Under the State Code Section of Disorderly Conduct,

17  yes.

18       Q     Okay.  And was that as a result of her just being

19  loud?

20       A     No.

21       Q     What was -- what was the basis of the arrest then?

22       A     It was the language that she was using.

23       Q     And is it your testimony that you had enough

24  information present to arrest her based on disorderly conduct

25  at the time?
```

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1      A    Yes, sir.
 2      Q    Who handcuffed and placed Ms. Gay in the patrol
 3  car?
 4      A    It was -- it was Officer Moore and I --
 5      Q    Do you --
 6      A    -- together.
 7      Q    Together?
 8      A    Yeah.
 9      Q    Did Ms. Gay say anything to you after being
10  handcuffed?
11      A    Yes.  She talked after being handcuffed, yes.
12      Q    Okay.  And what did she say?
13      A    Pertaining to what?
14      Q    Did you continue to try to question her after she
15  was handcuffed?
16      A    Once she was read the Miranda.
17      Q    So did you read her her Miranda rights?
18      A    No, sir.
19      Q    Do you recall who read her her Miranda rights?
20      A    I believe it was Officer Moore.
21      Q    And what was the -- what questions did you ask Ms.
22  Gay after she was read her Miranda rights?
23      A    What I wanted to know from the beginning, what was
24  the sequence of events that caused the altercation, anything
25  that surrounded the altercation.
```

OFFICER MATTHEW MADDEN - July 17, 2017

1      Q    And did she provide you that information?

2      A    She did.

3      Q    And what did she say happened?

4      A    She stated Mr. Garcia wanted to use her vehicle to

5   go to a Job Corps event.  She stated she did not want him to

6   use her vehicle and wanted the keys back.  She stated Mr.

7   Garcia dropped the keys on the ground and she said I'm not a

8   dog, I'm not picking them up.  She stated that Mr. Garcia

9   called her a bitch and she told him she did not want him at

10  the residence.

11           MR. SNELLING:  You want him to just read the

12      report?

13  BY MR. McWILLIAMS:   (Resuming)

14      Q    No, just -- I mean just refresh your recollection

15  by reading it and just tell me what you recall.

16      A    Okay.  Well, that's -- the report is what I recall.

17      Q    Okay.  Was Ms. Gay seat-belted when she was

18  transported in the patrol car?

19      A    I don't recall.

20      Q    Do you know who transported her to the jail?

21      A    I believe I did.

22      Q    And at the time of your decision to arrest Ms. Gay,

23  had any other officers located Mr. Garcia yet?

24      A    At the initial time or prior -- or afterwards?

25      Q    At the time you made the decision to arrest her.

OFFICER MATTHEW MADDEN - July 17, 2017

1      A    I don't recall when exactly the other officers came
2  in contact with Mr. Garcia.
3      Q    Is it common for a male in a domestic situation to
4  leave the scene prior to your arrival?
5      A    Define common.
6      Q    More often than not on the ones that you
7  investigated has the male been on premises when you were
8  investigating a domestic call?
9      A    More so than he's --
10      Q    Gone.  Are they usually gone when you get there?
11      A    They're there sometimes and sometimes not.
12      Q    Okay.  And is it common that in those situations,
13  where the male has gone when you arrived, that the other
14  partner no longer wants your help?
15      A    Sometimes that is true.
16      Q    And in those times, do you always insist that the
17  complainant provide you with information even when he or she
18  indicates your presence is no longer needed?
19      A    Depending on the circumstances of the dispatch and
20  what kind of call we were dispatched to.
21      Q    What types of calls would you normally be
22  dispatched to where you would absolutely insist on staying on
23  scene?
24      A    Where there was a crime that occurred.
25      Q    And when you approached Jamestown on this date had

OFFICER MATTHEW MADDEN - July 17, 2017

1  you been made aware that a crime had occurred?

2      A    I don't -- I don't know right offhand, but I

3  believe there was.

4      Q    Okay.  And what crime do you think had occurred?

5      A    According to the dispatch, I believe it was

6  battery.

7      Q    Do you know when Mr. Garcia was located?

8      A    I do not.

9      Q    Do you know which officer, if any, eventually made

10  contact with Mr. Garcia?

11     A    No officers did -- I don't recall exactly which

12  officers did.

13     Q    Do you -- were you made aware of any information

14  that Mr. Garcia may have relayed to the officers when they

15  made contact with them?

16     A    I believe Mr. Garcia was injured.

17     Q    And how did you receive that information?

18     A    Through officers who also met with Mr. Garcia.

19     Q    So you did meet with Mr. Garcia eventually?

20     A    According to this -- my report, I did.

21     Q    Okay.  So at some point, you made contact with Mr.

22  Garcia --

23     A    Yes, sir.

24     Q    -- after other officers had located him?

25     A    That is correct.

OFFICER MATTHEW MADDEN - July 17, 2017

1    Q   And did you interview Mr. Garcia yourself or did

2  the other officers who made contact with him interview Mr.

3  Garcia?

4    A   It appears I -- both, but I interviewed him.

5    Q   Did you make the decision to arrest Mr. Garcia as

6  well?

7    A   I did.

8    Q   Did the other officers advise you that there was

9  enough probable cause to arrest Mr. -- Ms. Gay for the

10  assault?

11    A   Did the other officers advise me?

12    Q   Right.  So the officers who originally encountered

13  Mr. Garcia, did they advise you that you had enough probable

14  cause to arrest Ms. Gay for the assault on Mr. Garcia?

15    A   I don't recall.

16    Q   And Mr. Garcia, was he arrested and charged with a

17  crime as well?

18    A   Yes, sir.

19    Q   What was that crime?

20    A   Simple battery and cruelty to children third

21  degree.

22    Q   At any time did you determine who the primary --

23  who was the primary aggressor in this domestic dispute?

24    A   Due to the conflicting statements, I was unable to

25  determine a primary aggressor.

OFFICER MATTHEW MADDEN - July 17, 2017

1      Q    Did you determine who it was that struck the

2  child's right eye?

3      A    Not definitively, no.

4      Q    What did the child tell you?

5      A    Initially, she stated daddy did it, but later, I

6  believe she said something else.

7      Q    Is -- based on your report, does it reflect that

8  she gave a contrary -- contradictory statement?

9      A    Not on my report, I don't believe so.

10     Q    And if -- if she did give a contradictory

11  statement, that would be something important to have in your

12  report?  Wouldn't it be an important fact to have in your

13  report?

14     A    I don't believe she said it to me so --

15     Q    But another officer gathered that information?

16     A    Possibly.

17     Q    And you were made aware of the information?

18     A    Yes.

19     Q    So if you were made aware of the information as the

20  arresting officer, again, wouldn't that have been something

21  important to have in your report?

22     A    It could be in the report, yes.

23     Q    Wouldn't it have been an important piece, if it was

24  a contradictory statement, to have in the report?

25     A    It's possible.

OFFICER MATTHEW MADDEN - July 17, 2017

1      Q    Okay.  And those reports, based on your training,

2   what's the purpose of a police report?

3      A    To have documentation for later.

4      Q    Okay.  And is it to inform the -- the general

5   public or anyone else regarding events that happened during

6   the course of your official duties as a police officer?

7      A    Of course.

8      Q    And is it important to make sure that those

9   accounts are accurate?

10     A    Yes, sir.

11     Q    Is it also important to make sure that those

12  accounts are complete?

13     A    Sure.

14     Q    So I'm just going to ask it again, because I don't

15  know that I got necessarily the clearest answer.  Wouldn't it

16  have been important, during the course of your investigation,

17  if you obtained information regarding the contradictory

18  statement of a witness to have that information in your

19  report?

20     A    The statement that she made in her contradictory

21  statement had nothing to do with the charges that I charged

22  Mr. Garcia and Ms. Gay with.

23     Q    Okay.  So it wasn't important to determine who

24  actually committed the battery on the child?

25     A    It was -- it's important, but it was undetermined

1  at the time, so --

2      Q    But, ultimately, you charged both parents with

3  third degree battery upon the child; is that correct?

4      A    Yes, but that -- that states that the child was a

5  witness or could hear the altercation, not that she was

6  actually struck.

7      Q    Okay.  But part of the basis for your arrest, was

8  it not, later in the warrant that you swore out, that the

9  child was struck?

10     A    In the warrant --

11     Q    You did swear out a warrant against Ms. Gay; is

12  that correct?

13     A    I did.

14     Q    In that warrant, you also charged her with third

15  degree battery on a child?

16     A    That's correct.

17     Q    What is your knowledge or understanding of what

18  third degree battery on a child is?

19     A    That a child is a witness to a family violence

20  altercation or is present during a family violence

21  altercation.

22     Q    Okay.  In addition to those things, you also had

23  knowledge the child had a mark on her face; is that correct?

24     A    That is correct.

25     Q    And that it was ultimately the basis for your

OFFICER MATTHEW MADDEN - July 17, 2017

1    investigation that you were trying to have with Ms. Gay; is
2    that right?
3              MR. SNELLING:   Object to the form.   You can answer
4        if you can.
5    BY MR. McWILLIAMS:   (Resuming)
6        Q    You ultimately were questioning Ms. Gay about the
7    mark on her child's face; is that right?
8        A    Ultimately, yes.
9        Q    Okay.
10       A    At some point I was, yes.
11       Q    So it was an important fact in the investigation;
12   correct?
13       A    Yes, the initial part, yes, it was.
14       Q    Okay.   So, at some point, where you get other
15   information regarding this important phase in the
16   investigation, would it not have been important to have that
17   in your report?
18       A    Sure.
19       Q    At the time that -- of your initial encounter with
20   Ms. Gay, when you and Officer Moore initially approached Ms.
21   Gay's door, were there any other people in the area?
22       A    Yeah, there was a group of people outside.
23       Q    Okay.   And based on the testimony given by Officer
24   Moore, this apartment -- Ms. Gay's door was elevated onto a
25   platform or balcony-looking area overlooking a courtyard; is

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1 | that correct?
 2 |      A    That's correct.
 3 |      Q    So you all were at an elevated position over that
 4 | courtyard at her door; is that right?
 5 |      A    Somewhat, yes.
 6 |      Q    And the people that were gathered, where were they?
 7 |      A    In the courtyard.
 8 |      Q    Were there any other people outside Ms. Gay's
 9 | apartment at the time that you initially in the encounter
10 | during your questioning?
11 |      A    Any other people?
12 |      Q    Yes, other than you, Officer Moore, Ms. Gay and her
13 | daughter.
14 |      A    The crowd was there.
15 |      Q    Okay.  And that crowd, you said that they were
16 | behind you in the courtyard; is that right?
17 |      A    If we were facing the door, they would be behind
18 | us.
19 |      Q    Okay.  In the courtyard below?
20 |      A    That's correct.
21 |      Q    At any time during your encounter with Ms. Gay, was
22 | the crowd below becoming an issue for you and your fellow
23 | officers?
24 |      A    As obstruction?
25 |      Q    Yes.
```

OFFICER MATTHEW MADDEN - July 17, 2017

```
1        A    No.
2        Q    Was anyone else arrested as a result of this
3    incident other than Ms. Gay and Mr. Garcia?
4        A    No, sir, not that I believe.
5        Q    At any time, did you speak to any witnesses that
6    were not inside Ms. Gay's apartment?
7        A    Yes, I did.
8        Q    And who did you speak with?
9        A    Natasha Moore.
10       Q    And what did Ms. Moore relay to you?
11       A    Would you like me to read the report?
12       Q    I just -- from what you recall.
13       A    Okay.  She heard altercations at Ms. Gay's
14   residence normally and then during this incident, she
15   observed a child with Mr. -- Mr. Garcia and Ms. Gay, so she
16   decided to call 911.
17       Q    At any time when you're interviewing a witness in a
18   situation like this, is it -- do you ever get a written
19   statement from the witness?
20       A    In Cobb County, I did not.  Not normally, no.
21       Q    It wasn't required?
22       A    No, it was not normal practice, no.
23       Q    Have you ever arrested someone else for cursing
24   under the disorderly conduct statute?
25            MR. SNELLING:  Object to the form.
```

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1  BY THE WITNESS:
 2       A    I don't recall.
 3       Q    Did you ever make any comments regarding Ms. Gay's
 4  parenting?
 5       A    No, not that I remember.
 6       Q    Did you ever hear Officer Moore make any comments
 7  about Ms. Gay's parenting?
 8       A    No, sir.
 9       Q    Do you know what the disposition of the charges
10  against Ms. Gay, what they ultimately ended up being?
11       A    Through court, I don't.
12       Q    Were you ever required to appear for any -- on any
13  of those charges?
14       A    Not that I recall.
15       Q    Do you have any family that live in Cherokee
16  County?
17       A    No, I don't think so.
18       Q    Clayton County?
19       A    No.
20       Q    Cobb County?
21       A    No.
22       Q    DeKalb County?
23       A    I don't believe so.
24       Q    Douglas County?
25       A    Yes.
```

OFFICER MATTHEW MADDEN - July 17, 2017

1      Q     Who -- what family members do you have that live in
2   Douglas?
3      A     In-laws.
4      Q     And what are their -- what are their names?
5      A     Daniel and Katie Adair.
6      Q     Can you spell that last name for me?
7      A     A-D-A-I-R.
8      Q     And those are your wife's parents?
9      A     No, those are my wife's -- that's my wife's brother
10  and -- that's my brother and sister-in-law.
11     Q     Okay.  Do they have any adult children?
12     A     They do not.
13     Q     Any other family -- and they're in Douglas County?
14     A     I don't think so.
15     Q     Okay.  So Daniel and Katie live in -- is it DeKalb
16  or Douglas?
17     A     Douglas, I believe.
18     Q     Okay.  You got any family that live in Fulton
19  County?
20     A     I don't believe so.
21     Q     What about Gwinnett County?
22     A     Yes, I have a lot of people in Gwinnett County.
23     Q     Okay.  Who lives in Gwinnett County?
24     A     You just want family?
25     Q     Yeah, I want immediate -- look, I'm asking this

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1    because this case is pending in the Federal District Court --
 2         A    Of course.
 3         Q    -- and one of the counties that it falls within
 4    there where we would pull jurors from is in Gwinnett, so I'll
 5    need their names if you could and their relationship to you.
 6         A    Okay.
 7         Q    So parents, brothers, sisters, brother and sister-
 8    in-laws, adult kids.
 9         A    My parents are Tony and Lynn Madden.
10         Q    Is it T-O-N-Y?
11         A    Yeah.  Actually it's Anthony.
12         Q    Okay.
13         A    And Marsha Madden.
14         Q    Okay.  Those are your parents?
15         A    Those are my parents.
16         Q    All right.  Anybody else?
17         A    Yeah.  Michael Madden, that's my brother.
18         Q    Okay.  Anybody else?
19         A    My parent-in-laws are Jerry and Becky Hart.
20         Q    Is Jerry G -- J-E-R-R-Y?
21         A    Yes.
22         Q    And Becky?
23         A    Uh-huh.
24         Q    All right.  And last name is?
25         A    Hart, H-A-R-T.
```

OFFICER MATTHEW MADDEN - July 17, 2017

1    Q    Okay.  And those are your wife's parents?

2    A    Yes.

3    Q    Okay.

4    A    And then that's -- I believe that's it.

5    Q    Does your wife have any brothers and sisters?

6    A    Yes.

7    Q    Do they live in Gwinnett County?

8    A    The brother lives in Douglas County.

9    Q    Okay.

10   A    There's another brother.  I believe he might live

11   in Gwinnett County as well.

12   Q    You know what his name is?

13   A    Yeah, it's Josh -- Joshua Adair, same last name.

14   Q    Now, your brother, Michael, does he have any adult

15   kids?

16   A    No.

17   Q    And Josh Adair, you know if he's married?

18   A    He does not have any adult kids.

19   Q    Okay.  But is he -- is he married?

20   A    I don't think they're married.

21   Q    He have a significant other that you're aware of?

22   A    Yes.

23   Q    What is her name?

24   A    I don't know.

25   Q    Okay.  Is Michael your only sibling?

OFFICER MATTHEW MADDEN - July 17, 2017

```
 1       A     Yes.
 2       Q     You have any other family that live in Gwinnett
 3   County?
 4       A     Not -- not direct family, no.
 5       Q     Okay.  You have indirect family?  Is this aunts --
 6       A     Yeah, I --
 7       Q     -- uncles or cousins?
 8       A     Yeah, I have like my -- my wife's grandparents live
 9   in Gwinnett.
10       Q     Are their last names Adair?
11       A     No.  Their last name is Van -- Van Deusen.
12       Q     I'm going to -- I'm going to assume by your attempt
13   to -- to pronunciate that, you don't know how to spell it?
14       A     No.
15       Q     Okay.  But it's Van Deusen?
16       A     Yeah.
17       Q     And we'll just -- do you know what their first
18   names are?
19       A     Yeah, Richard and Ann.
20       Q     And those are your wife's grandparents?
21       A     Yes.  And she has another grandmother that lives in
22   Gwinnett too, Ruby Hart.
23       Q     Good southern name.
24       A     Yeah.
25       Q     H-E-A-R-T or H-A-R-T?
```

OFFICER MATTHEW MADDEN - July 17, 2017

1      A     H-A-R-T, same as the -- her parents.

2      Q     Okay.  All right.  Is that it?

3      A     I think so.

4      Q     Okay.  Now, your wife only has the brothers, Daniel

5    and Josh?

6      A     That's it.

7      Q     Okay.  You have any family that live in Henry

8    County?

9      A     Yes.  We're doing extended family now, right?

10     Q     Yes.

11     A     Yeah, I have an aunt and uncle that live in Henry

12   County.

13     Q     And what are their names?

14     A     Carroll and Teresa Madden.

15     Q     Spell Carroll for me.

16     A     I think it's C-A-R-R-O-L, maybe two L's.

17     Q     Okay.  And Teresa, T-E-R --

18     A     S-H-A.

19     Q     Okay.  And that last name is Madden?

20     A     That's correct.

21     Q     And your aunt and uncle, do they have any adult

22   children?

23     A     Yes, Abigail Madden.

24     Q     Okay.  How old is Abigail?

25     A     She's like 20-something.

OFFICER MATTHEW MADDEN - July 17, 2017

1    Q    Okay.  Any other --

2    A    No, that's the only one.

3    Q    Any other folks in Henry County?

4    A    That's it.

5    Q    Newton County?

6    A    No, I don't think so.

7    Q    And Rockdale County?

8    A    None in Rockdale.

9    Q    Okay.  Do you have any documents or anything in

10   your possession regarding this incident that took place?

11   A    Just y'all's.  I don't even know if I have that

12   anymore.

13   Q    Okay.  So you don't have any -- any reports or

14   recordings or any other items relating to the incident that

15   we're here about today?

16   A    No, sir.

17   Q    No other questions.  Thank you very much for your

18   time.

19   A    Thank you.

20       (Whereupon, the deposition in the above-entitled

21       matter was concluded at approximately 11:29 a.m.)

22

23

24

25

# REPORTING OFFICER NARRATIVE

*Cobb County Police*

| OCA | Victim | Offense | Date / Time Reported |
|---|---|---|---|
| *14-060229* | *Society* | *SIMPLE ASSAULT/SIMPLE BATTERY* | *Wed 07/16/2014 13:35* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

On 07/16/2014 I was dispatched to a domestic dispute at 1565 Crider Rd (Jamestown Village Apartments). I arrived and immediately observed a young girl who appeared afraid and distraught near building 30. I exited my patrol and observed the young girl was crying. I asked her was she okay and what happened. She stated her parents were fighting. I asked her to show me what apartment she lives in and she did. While walking to the apartment the young girl stated she did not want her father to go to jail. I knocked on the door and the child`s mother, Lacarsha Gay, opened the door.

I asked Gay what was going on and she stated "he left already." The young girl walked passed me to enter the residence and I observed a fresh scratch and abrasion around her right eye. Officer Moore asked her what happened and she stated "daddy did it." The child continued to state what happened but Gay pulled her inside the residence and talked over the child. I told Gay to allow the child to talk but she stated I was scaring the child. Gay stated the other person involved has left and that we need to go looking for him. I asked her for her information and for the male`s information but she yelled at me stating "I already gave you that information." She began yelling at the officers on scene stating that we are abusing our authority. She attempting to close the door to the residence but I stepped in the door way so she was unable to close the door. I advised Gay we were not leaving until we have investigated the incident and obtained everyone`s information to write a report.

Gay began yelling obscene language as loud as she could and also stating it was against the law for me to come inside her residence. She stated "fuck you" and told me to "get the fuck out of my house." We advised Gay she could not use obscene and offensive while there was a group of people and small children present. I even pointed out the small child at the bottom of the stairs approximately 20 feet away from Gay. Gay stated "fuck you motherfucker" and also called Officer Moore a "nigger." Gay stated she could say anything she wants because she was an adult in her own house. Gay stated all of this while at the threshold of the door to her residence clearly heard by neighbours outside. As Gay continued cussing and calling everyone names I told her to place her hands behind her back because she was under arrest. I decided to place Gay under arrest because she continued to yell obscene and offensive language while neighbors were outside Gay`s residence with small children. Gay did not place her hands behind her so I grabbed her by the left wrist but she attempted to pull away. I continued to hold her with pressure around her left wrist as she still attempted to pull away. She held onto the door of the residence so we were unable to pull her outside from the door. Officer Moore went around Gay and grabbed her other wrist and we pulled her outside while she was still attempting to pull her arms away and escape inside the residence. Officer Moore and I were able to place her wrists in handcuffs without any injury to us or Gay. Gay was placed into the rear of my patrol car.

Detective Wells with the Domestic Violence Unit was advised of the incident. She arrived and interviewed the young girl involved.

Gay was read her Miranda Warning and she stated she under stood. She stated she would be willing to talk to police about the incident. She stated her child`s father, Daniel Garcia, was wanting to use her vehicle to go to a job core event. She stated she did not want him to use her vehicle and wanted the keys back. She stated Garcia dropped the keys on the ground and she stated "I`m not a dog, I`m not picking them up." She stated Garcia called her a "bitch" and she told him she did not want him at the residence. She stated he was wanting inside the residence and she was attempting to keep him out of the residence. Garcia pulled Gay by the hair to get her out of the residence while they were in a physical altercation. Garcia entered the residence to obtain some belongings and closed the door. Gay stated he did not lock the door so she was able to enter the residence to call 911. She stated while her and Garcia were in a physical altercation slightly outside the door of the residence her child was struck in the eye. Gay stated "who knows what happen."

I observed some of Gay`s hair fell on scene.

PLAINTIFF'S EXHIBIT 4 SFR 7/17/17

PENGAD 800-631-6989

Reporting Officer: *MADDEN, M. C.*

Printed By: CAVENC, 6619 10/11/2016 19:37

## REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| *Cobb County Police* | | *14-060229* |
| Victim | Offense | Date / Time Reported |
| *Society* | *SIMPLE ASSAULT/SIMPLE BATTERY* | *Wed 07/16/2014 13:35* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

I met with Garcia and he stated he wanted to use Gay's vehicle to go to a candy factory for work. He stated she did not want him to use the vehicle so he gave her the keys. He stated he put the keys in her hand but she did not want to hold them so they fell to the ground. Gay stated she did not want Garcia at the residence but Garcia stated he was not leaving until he retrieved some belongings. He entered the residence and grabbed his backpack. He put the backpack on and was leaving but Gay did not like that he retrieved belongs. He stated Gay attempted to grab his backpack but missed and scratched his neck. He stated it was an accident and she did not mean to cause any injury. Garcia stated he did not remember hitting his daughter during the incident and does not know how she obtained injury. Garcia also stated he and Gay have had problems in their relationship for years. They moved from Illinois to Georgia in March and have had struggles relationally.

I observed several scratches and abrasions on the left side of Garcia's neck which appeared to be from fingernails.

I met with a neighbor, Natisha Moore, who stated every morning she wakes up to yelling, arguing, and fighting from the apartment next to her. She stated sometimes Gay and Garcia are so loud during the night they wake Moore's children. She stated she heard arguing as usual but it sounded physical this time. She stated they were outside the door to the residence and the child was behind them as they were pushing each other. She heard the doors slamming next door and Gay yell "get out, get out" and Gay began to cry. She continued to hear the altercation and heard a little girl say "stop, stop ,stop." She has never heard or seen a child before so she called 911. Moore continued to hear cussing, yelling, and fighting for several more minutes.

Sergeant Dorsey took photographs of the involved parties and placed them into evidence at precinct three.

Detective Wells took custody of the child on scene.

I transported Gay to the Cobb County A.D.C. while Officer Abernathy transported Garcia to the Cobb County A.D.C. Both were released into the custody of the intake deputies.

I later secured a warrant for Gay under warrant number (14-W-6275) for disorderly conduct, obstruction, simple battery, and cruelty to child third degree.

I also secured a warrant for Garcia under warrant number (14-W-6274) for simple battery, and cruelty to child third degree.

C E R T I F I C A T E

STATE OF GEORGIA      )

COUNTY OF FULTON      )


        I, Susan F. Roper, Certified Court Reporter and

Notary Public in and for Fulton County, Georgia, do hereby

certify that the foregoing deposition was taken down by me,

as stated in the caption; that the foregoing questions and

answers were reduced to print by me via speech recognition;

that the foregoing pages 4 through 50 represent a true,

correct and complete transcript of the evidence given by the

witness, MATTHEW MADDEN, who was first duly sworn by me; that

I am not a relative, employee, attorney or counsel of any of

the parties; that I am not a relative or employee of attorney

or counsel for any of said parties; nor am I financially

interested in the outcome of the action.

        This the 24th day of July, 2017.


                        SUSAN F. ROPER, CCR-B-1106
                        Certified Court Reporter

D I S C L O S U R E

STATE OF GEORGIA

COUNTY OF FULTON

      Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

      I am a Georgia Certified Court Reporter. I am here as a representative of Mueller Reporting, LLC.

      Mueller Reporting, LLC was contacted by the offices of KENDRICK K. McWILLIAMS, SR., ESQUIRE to provide court reporting services for this deposition. I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 1514-37 (a)(b).

      I have no contract/agreement to provide court reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. I will charge the usual and customary rates to all parties in the case, and a financial discount will not be given to any party in this litigation.

      DATED: July 17, 2017

                   SUSAN F. ROPER, CCR-B-1106

# E R R A T A   S H E E T

I hereby certify that I have read the foregoing and within Pages 4 through 50 and no changes are required:

_____
MATTHEW MADDEN

Sworn to and subscribed before me, this _____ day of _____, 2017.

_____
Notary Public

My commission expires:

_____

* * * * * * * * * * *

I hereby certify that I have read the foregoing and within Pages 4 through 50 and I wish to make the following changes:

Page _____ Line _____: _____

Page _____ Line _____: _____

Page _____ Line _____: _____

Page _____ Line _____: _____

Page _____ Line _____: _____

_____
MATTHEW MADDEN

Sworn to and subscribed before me, this _____ day of _____, 2017.

_____
Notary Public

My commission expires:

_____                    sfr

Lacarsha Gay vs.
Cobb County, Georgia, et al.

Case 1:16-cv-02539-MLB   Document 52   Filed 10/16/17   Page 57 of 63

OFFICER MATTHEW MADDEN
July 17, 2017

**A**

Abigail (2)
49:23,24
able (4)
20:16,18;25:25;
32:1
above-entitled (1)
50:20
abrasions (1)
22:13
absolutely (1)
35:22
Academy (3)
8:18,20;12:1
access (1)
28:24
accident (3)
11:14,20,21
accidents (1)
11:13
According (2)
36:5,20
accounts (2)
39:9,12
accurate (1)
39:9
Act (1)
4:17
Action (2)
4:12;30:4
activity (3)
16:12,13,14
actually (4)
19:12;39:24;40:6;
46:11
Adair (4)
45:5;47:13,17;
48:10
A-D-A-I-R (1)
45:7
addition (1)
40:22
adult (5)
45:11;46:8;47:14,
18;49:21
advise (3)
37:8,11,13
afterwards (1)
34:24
again (5)
13:16;22:25;28:5;
38:20;39:14
against (2)
40:11;44:10
aggressor (2)
37:23,25
ago (1)
19:2
agreeable (2)
4:21,22
ahead (3)
4:3;21:18;27:24
allow (1)
9:11
allowed (1)
27:13
altercation (8)
25:5;26:4,16;
33:24,25;40:5,20,21
altercations (3)
17:23,24;43:13
Although (1)
21:10
always (2)
17:1;35:16
Amber (1)
7:9
Ann (1)
48:19
answered (1)
31:17
Anthony (1)
46:11
anymore (1)
50:12
apartment (12)
14:20,21,25;17:3,7,
9;18:18;23:10,22;
41:24;42:9;43:6
apartments (1)
19:5
appear (2)
19:12;44:12
appeared (3)
20:12;23:15,21
appears (1)
37:4
approached (4)
20:8;24:9;35:25;
41:20
approval (1)
9:14
approved (2)
9:13;10:6
approximate (1)
17:13
approximately (1)
50:21
area (7)
16:5,11,14;17:3;
25:6;41:21,25
areas (3)
14:8;16:21,22
Around (1)
17:15
arrest (16)
18:19,22,23;31:2,
6;32:3,10,14,21,24;
34:22,25;37:5,9,14;
40:7
arrested (6)
18:17,24;32:6;
37:16;43:2,23
arresting (1)
38:20
arrival (1)
35:4
arrive (1)
12:15
arrived (8)
15:11;19:3,18;
21:23;22:17,20;24:6;
35:13
assault (2)
37:10,14
assigned (3)
15:19,24,25
assignment (2)
14:11,13
associate's (2)
7:1;9:7
assume (2)
5:10;48:12
Atlanta (3)
8:1,3,17
attempt (3)
31:20,24;48:12
attesting (1)
13:5
aunt (2)
49:11,21
aunts (1)
48:5
aware (10)
12:3,18;13:10;
26:18;28:20;36:1,13;
38:17,19;47:21

**B**

back (3)
5:18;24:1;34:6
balcony-looking (1)
41:25
Baseball (2)
8:18,20
based (6)
16:11,18;32:24;
38:7;39:1;41:23
basic (2)
11:14,20
basis (5)
5:7;32:9,21;40:7,
25
battery (3)
36:6;37:20;39:24;
40:3,15,18
became (1)
11:17
Becky (2)
46:19,22
become (1)
11:8
becoming (1)
42:22
began (1)
29:20
begin (1)
25:8
beginning (1)
33:23
behind (2)
42:16,17
below (2)
42:19,22
birth (2)
6:6;25:25
bit (2)
12:6,11
bitch (1)
34:9
Both (3)
10:16;37:4;40:2
break (1)
5:21
Brian (1)
10:3
brother (7)
45:9,10;46:7,17;
47:8,10,14
brothers (3)
46:7;47:5;49:4

**C**

call (17)
12:9;15:1,4,8;16:4;
17:7;19:5,7,9,12,14,
15;22:18;28:15;35:8,
20;43:16
called (3)
4:25;26:19;34:9
calls (10)
11:25;12:3,4,13,15,
19;18:5;26:20,21;
35:21
came (2)
13:10;35:1
camps (1)
8:22
can (12)
5:15;16:24;18:5;
21:1;22:5;24:1;25:9;
26:10,25;41:3,4;45:6
capacity (2)
18:11,15
car (2)
33:3;34:18
care (1)
21:5
C-A-R-R-O-L (1)
49:16
Carroll (2)
49:14,15
case (3)
4:7,11;46:1
cashier (1)
8:21
cause (7)
29:7,10;32:11,12,
14;37:9,14
caused (1)
33:24
caveat (1)
5:23
certain (1)
12:15
certainly (1)
30:7
certification (2)
7:17;11:7
certified (1)
16:7
chain (1)
9:16
changes (1)
9:25
charge (1)
32:10
charged (4)
37:16;39:21;40:2,
14
charges (3)
39:21;44:9,13
Cherokee (1)
44:15
child (11)
20:11;38:4;39:24;
40:3,4,9,15,18,19,23;
43:15
children (3)
37:20;45:11;49:22
child's (3)
22:13;38:2;41:7
circumstances (2)
27:13;35:19
City (9)
6:9,11,14,16,22;
7:10;9:10,24;10:10
Civil (2)
4:12,17
Clayton (2)
6:5;44:18
clear (1)
14:24
clearest (1)
39:15
close (4)
9:6;30:15;31:20,24
closed (1)
31:8
closing (1)
31:15
Cobb (21)
4:8,8,8;6:17;7:12,20,
23,25;8:14;11:8,18;
12:21;13:7;14:5,9;
16:7;27:17,19,20,21;
43:20;44:20
Code (1)
32:16
College (1)
7:5

Case 1:16-cv-02539-MLB    Document 52    Filed 10/16/17    Page 58 of 63
Lacarsha Gay vs.
Cobb County, Georgia, et al.

OFFICER MATTHEW MADDEN
July 17, 2017

coming (1)
7:25
command (1)
9:16
comments (2)
44:3,6
committed (5)
29:7,11,16;30:1;
39:24
committing (1)
29:13
common (4)
25:4;35:3,5,12
complainant (1)
35:17
complete (2)
7:16;39:12
complex (9)
14:20,21,25;16:12;
17:3,7,9;18:18;19:22
concern (1)
30:21
concluded (1)
50:21
conduct (8)
18:17,23;25:23;
32:8,13,16,24;43:24
conducted (1)
8:22
conflicting (1)
37:24
confrontational (1)
23:16
confusing (3)
5:8;21:7,8
consent (1)
27:7
consider (2)
10:20;30:4
consistent (1)
14:10
contact (5)
35:2;36:10,15,21;
37:2
contents (1)
13:2
continue (1)
33:14
continuing (1)
11:9
contradictory (5)
38:8,10,24;39:17,
20
contrary (1)
38:8
control (1)
8:7
conversation (3)
20:16;21:25;22:4
copy (2)
12:23;20:24
Corps (1)
34:5

counties (1)
46:3
County (39)
4:8,8;6:18;7:12,20,
23,25;8:14;11:8,18;
12:21;13:7;14:6,9;
16:7;27:17,19,20,21;
43:20;44:16,18,20,
22,24;45:13,19,21,
22,23;47:7,8,11;48:3;
49:8,12;50:3,5,7
course (9)
11:14,21;12:2;
17:1;28:19;39:6,7,
16;46:2
courses (1)
27:18
coursework (1)
9:2
court (6)
4:5,11;5:13;21:11;
44:11;46:1
courtyard (5)
41:25;42:4,7,16,19
cousins (1)
48:7
cover (1)
14:20
create (1)
17:24
crime (11)
16:23;29:7,11,13,
16;30:1;35:24;36:1,
4;37:17,19
Criminal (5)
9:8;16:12,13,14;
17:2
CROSS-EXAMINATION (1)
5:2
crowd (3)
42:14,15,22
cruelty (1)
37:20
current (3)
10:1,2;13:19
currently (2)
6:8;10:4
cursing (5)
29:12,13,17,20;
30:25;43:23

**D**

daddy (5)
22:9,15,22;23:1;
38:5
Dae (3)
10:9,11,13
Daniel (3)
45:5,15;49:4
date (4)
5:18;6:6;25:25;
35:25

daughter (12)
20:6,7,8;21:22;
23:11;25:12,12,13,
14;30:9,11;42:13
day (2)
14:10,12
days (3)
13:20,21,22
December (1)
7:18
decide (1)
19:8
decided (2)
30:2;43:16
decision (6)
31:2,5;32:3;34:22,
25;37:5
Define (1)
35:5
definitively (1)
38:3
degree (6)
7:1;9:7;37:21;40:3,
15,18
DeKalb (2)
44:22;45:15
Department (5)
4:9;7:12;8:1,15;
27:17
Depending (1)
35:19
deposition (5)
4:7,16;5:18;21:3;
50:20
Design (3)
8:1,3,17
desk (1)
8:21
Detective (2)
15:25;16:2
determine (4)
37:22,25;38:1;
39:23
Deusen (2)
48:11,15
different (1)
7:11
direct (2)
9:17;48:4
directly (1)
9:18
dis (1)
22:18
disorderly (8)
18:17,23;32:8,13,
15,16,24;43:24
Dispatch (10)
19:6,7,14,14,16;
23:5,8;28:15;35:19;
36:5
dispatched (4)
12:14;19:15;35:20,
22

disposition (1)
44:9
dispute (3)
28:17,21;37:23
distraught (1)
20:12
District (3)
4:11,12;46:1
disturbance (1)
17:9
document (1)
13:4
documentation (1)
39:3
documents (1)
50:9
dog (1)
34:8
domestic (17)
11:25;12:2,4,9,12,
13,15,18;15:1,4;17:7,
8;28:16,21;35:3,8;
37:23
done (1)
21:20
door (22)
23:13,16,16,18;
24:10;29:24;30:2,5,
14,15;31:8,10,11,13,
15,20,23,24;41:21,
24;42:4,17
doorway (1)
31:7
Dorsey (3)
4:9,10;15:14
Douglas (6)
44:24;45:2,13,16,
17;48:7
down (3)
5:14,15,17
dropped (1)
34:7
Due (1)
37:24
duly (1)
4:25
during (22)
11:21;12:2;14:5;
18:5;19:20;23:23;
24:24,25;26:8;27:18,
20;28:15,19;29:8,15;
30:18;39:5,16;40:20;
42:10,21;43:14
duties (3)
7:10,11;39:6
duty (3)
10:20,23,25

**E**

earlier (1)
9:20
easier (2)

5:17,17
education (1)
6:25
eights (2)
14:7,8
elevated (2)
41:24;42:3
else (7)
17:5;38:6;39:5;
43:2,23;46:16,18
e-mailed (1)
13:12
employed (3)
6:8,17;16:6
employment (2)
6:16,20
encounter (8)
18:10;22:8;23:17;
29:15;30:18;41:19;
42:9,21
encountered (7)
18:10;19:4;20:1,5;
21:22;22:12;37:12
encounters (3)
17:18;18:6,14
ended (1)
44:10
enforcement (2)
7:22;11:9
engage (1)
32:1
enough (3)
32:23;37:9,13
entail (2)
10:13;12:13
entailed (1)
12:7
enter (6)
26:23;27:1,4,7,9,14
entire (3)
16:6,10,19
entry (3)
27:21,25;28:1;
29:19,21
escalate (1)
25:8
escalation (1)
29:18
even (3)
11:4;35:17;50:11
event (1)
34:5
events (3)
26:15;33:24;39:5
Eventually (3)
26:6;36:9,19
exactly (3)
20:23;35:1;36:11
examined (1)
5:1
Exhibit (2)
21:15;28:2
exigent (1)

Case 1:16-cv-02539-MLB    Document 52    Filed 10/16/17    Page 59 of 63

Lacarsha Gay vs.
Cobb County, Georgia, et al.

OFFICER MATTHEW MADDEN
July 17, 2017

27:12
existed (1)
  27:13
experience (3)
  7:19;16:11,18
explain (1)
  27:4
express (1)
  30:21
ex-side (1)
  10:14
extended (1)
  49:9
exterior (1)
  10:15
eye (1)
  38:2

**F**

face (3)
  22:13;40:23;41:7
facing (1)
  42:17
fact (4)
  22:7;26:13;38:12;
  41:11
fail (1)
  25:24
fair (5)
  5:11,20;6:1;30:8,
  16
falls (1)
  46:3
familiar (3)
  27:21;28:8,9
family (12)
  40:19,20;44:15;
  45:1,13,18,24;48:2,4,
  5;49:7,9
far (2)
  12:7;25:22
farmer's (1)
  10:9
fearful (1)
  30:19
February (1)
  15:8
Federal (3)
  4:11,17;46:1
fellow (1)
  42:22
few (1)
  15:11
figured (1)
  20:13
finished (1)
  9:1
first (9)
  4:20,25;17:20;
  19:4,4,23,25;20:4;
  48:17
five (4)

14:7,8;17:14,15
five-two (1)
  13:24
Flooring (3)
  8:1,3,17
folks (3)
  15:19,22;50:3
follows (1)
  5:1
foot (7)
  29:23;30:2,5,14;
  31:10,13,23
form (7)
  4:18;16:16,24;
  18:2;25:9;41:3;43:25
forms (1)
  5:7
four (4)
  13:22,24,24;21:2
four-year (1)
  16:10
free (3)
  30:7,9,15
front (1)
  8:21
full (1)
  6:3
Fulton (1)
  45:18

**G**

gain (1)
  29:19
Garcia (27)
  17:8;18:14;24:17,
  21;25:3,15;34:4,7,8,
  23;35:2;36:7,10,14,
  16,18,19,22;37:1,3,5,
  13,14,16;39:22;43:3,
  15
Garcia's (3)
  26:5,9,11
gathered (2)
  38:15;42:6
gave (3)
  26:8,12;38:8
Gay (41)
  4:8;5:5;15:5;17:7;
  18:11,24;23:13;24:9,
  13,14;25:8,13;26:9,
  21;28:23;29:6,10;
  30:15,18,24;31:3,5;
  32:1,3;33:2,9,22;
  34:17,22;37:9,14;
  39:22;40:11;41:1,6,
  20;42:12,21;43:3,15;
  44:10
Gay's (19)
  18:18,22;20:6,7,8;
  21:22;23:11,15,22;
  25:3;26:23;27:1;
  41:21,24;42:8;43:6,

13;44:3,7
general (3)
  20:4;24:19;39:4
Generally (2)
  7:13;14:11
Georgia (5)
  4:8,12;7:5;9:2,4
given (1)
  41:23
Good (1)
  48:23
graduate (1)
  8:24
graduated (1)
  9:4
graduating (1)
  8:24
grandmother (1)
  48:21
grandparents (2)
  48:8,20
ground (1)
  34:7
grounds (1)
  32:9
group (1)
  41:22
guidelines (1)
  12:3
guns (2)
  28:16,20
Gwinnett (9)
  45:21,22,23;46:4;
  47:7,11;48:2,9,22

**H**

handcuffed (4)
  33:2,10,11,15
happened (3)
  22:9;34:3;39:5
happy (1)
  5:9
harm (2)
  17:25;18:7
Hart (3)
  46:19,25;48:22
H-A-R-T (3)
  46:25;48:25;49:1
head (1)
  5:15
hear (2)
  40:5;44:6
heard (1)
  43:13
H-E-A-R-T (1)
  48:25
help (1)
  35:14
Henry (3)
  49:7,11;50:3
herein (1)
  4:25

highest (1)
  6:25
home (4)
  14:4;28:24;29:19,
  22
homeschool (1)
  9:1
homeschooled (1)
  8:25

**I**

identification (1)
  21:16
identify (1)
  26:1
immediate (2)
  16:11;45:25
important (12)
  38:11,12,21,23;
  39:8,11,16,23,25;
  41:11,15,16
incident (13)
  5:6;14:14,21;
  18:12;23:23;24:1,19;
  25:7,22;43:3,14;
  50:10,14
include (1)
  11:12
indicates (1)
  35:18
indirect (1)
  48:5
inform (1)
  39:4
information (26)
  12:16;24:18,19,20,
  23;25:12,15,22,22,
  24,25;26:11,11,12,
  14;32:24;34:1;35:17;
  36:13,17;38:15,17,
  19;39:17,18;41:15
initial (10)
  23:17;24:25;26:8;
  28:19;29:6,9,15;
  34:24;41:13,19
initially (10)
  22:13;23:24,25;
  24:5,9,10;32:6;38:5;
  41:20;42:9
initiated (1)
  18:22
injured (1)
  36:16
In-laws (2)
  45:3;46:8
inside (4)
  10:14;25:12,14;
  43:6
insist (2)
  35:16,22
instead (1)
  22:23;23:2

instruct (1)
  12:7
interview (2)
  37:1,2
interviewed (1)
  37:4
interviewing (1)
  43:17
into (5)
  27:22,25;28:1;
  29:19,21
investigate (1)
  11:13
investigated (5)
  15:1,4;17:8;18:1;
  35:7
investigating (4)
  12:8,13,18;35:8
investigation (12)
  11:21;12:4;28:19;
  29:6,9;39:16;41:1,11,
  16
involve (1)
  18:6
involved (6)
  17:21,23;23:7;
  26:4;28:16,20
issue (1)
  42:22
items (1)
  50:14

**J**

jail (1)
  34:20
Jamestown (4)
  14:21,25;19:5;
  35:25
Jerry (2)
  46:19,20
J-E-R-R-Y (1)
  46:20
job (10)
  6:10;7:10,11,20;
  8:8,9,11;9:12;10:13;
  34:5
jobs (6)
  7:22;9:11,15;10:4,
  5,8
joining (1)
  8:14
Josh (3)
  47:13,17;49:5
Joshua (1)
  47:13
July (2)
  14:25;16:5
jurors (1)
  46:4
Justice (1)
  9:8

Case 1:16-cv-02539-MLB   Document 52   Filed 10/16/17   Page 60 of 63

Lacarsha Gay vs.
Cobb County, Georgia, et al.

OFFICER MATTHEW MADDEN
July 17, 2017

## K

Katie (2)
    45:5,15
keep (1)
    21:11
Kendrick (1)
    5:4
keys (2)
    34:6,7
kids (3)
    46:8;47:15,18
kind (3)
    12:20;18:7;35:20
knew (1)
    30:3
knowing (4)
    13:1,3;20:3;27:17
knowledge (2)
    40:17,23
known (2)
    16:12;17:3

## L

LaCarsha (3)
    4:8;5:5;15:5
language (1)
    32:22
last (8)
    10:5;19:1;45:6;
    46:24;47:13;48:10,
    11;49:19
late (1)
    24:8
later (5)
    5:18;21:7;38:5;
    39:3;40:8
law (2)
    7:22;11:9
lawsuit (1)
    5:7
least (1)
    28:13
leave (2)
    28:24;35:4
led (1)
    23:10
left (3)
    8:23;24:22;25:16
less (6)
    14:3;17:14,17;
    21:6,8;30:9
lessons (1)
    8:22
level (1)
    6:25
Lilburn (10)
    6:9,9,11,14,17,22;
    7:10;9:10,24;10:10
little (2)
    12:6,11

live (10)
    44:15;45:1,15,18;
    47:7,10;48:2,8;49:7,
    11
lives (4)
    18:8;45:23;47:8;
    48:21
located (1)
    34:23;36:7,24
location (4)
    15:2,5;23:6;26:17
long (3)
    6:13;12:11;16:5
longer (2)
    35:14,18
look (2)
    26:10;45:25
looked (1)
    19:1
looking (1)
    26:2
lot (3)
    5:16;8:4;45:22
loud (3)
    26:24;27:2;32:19
L's (1)
    49:16
Lynn (1)
    46:9

## M

Madden (15)
    4:6,7,9,13,14,24;
    5:4;6:5;7:9;46:9,13,
    17;49:14,19,23
maintenance (2)
    8:7,21
majority (1)
    20:2
male (3)
    35:3,7,13
mandate (2)
    11:14,15,22;27:18
many (5)
    7:19;15:1;17:11,
    20;23:21
mark (4)
    20:25;28:5;40:23;
    41:7
marked (2)
    21:15;28:2
market (1)
    10:9
married (4)
    7:6;47:17,19,20
Marsha (1)
    46:13
matter (1)
    50:21
MATTHEW (2)
    4:24;6:5
may (2)

26:18;36:14
maybe (3)
    17:17;21:1;49:16
MC (1)
    4:9
McCann (1)
    10:3
McWILLIAMS (17)
    4:3,6;5:3,5;16:17;
    21:3,6,9,17;22:24;
    24:3;28:1,4,6;31:18;
    34:13;41:5
mean (3)
    10:14;17:1,19;
    34:14
meet (1)
    36:19
member (1)
    20:4
members (1)
    45:1
memo (1)
    13:12
mention (1)
    28:15
mentioned (1)
    19:21
met (1)
    36:18
Michael (3)
    46:17;47:14,25
might (1)
    47:10
Military (1)
    9:21
Miranda (4)
    33:16,17,19,22
moment (1)
    21:18
months (2)
    10:5;19:2
Moore (17)
    4:10;15:12;20:2;
    22:8;23:25;24:5,10,
    14;30:21;33:4,20;
    41:20,24;42:12;43:9,
    10;44:6
more (9)
    5:23;12:10;16:23;
    17:1,5,13;30:9;35:6,9
Much (2)
    21:8;50:17
multiple (1)
    26:20
Mun (3)
    10:9,11,13

## N

Nam (3)
    10:9,11,13
name (17)
    5:4;6:3;7:8;9:24;

23:8;25:25;26:2,5,9;
    45:6;46:24;47:12,13,
    23;48:11,23;49:19
named (1)
    15:18
names (8)
    15:8,10;23:6;45:4;
    46:5;48:10,18;49:13
narcotics (2)
    28:16,20
Natasha (1)
    43:9
necessarily (1)
    39:15
need (4)
    5:21;12:16;26:14;
    46:5
needed (1)
    35:18
new (2)
    13:9,14
Newton (1)
    50:5
nods (1)
    5:15
None (1)
    50:8
normal (1)
    43:22
normally (3)
    35:21;43:14,20
Northern (1)
    4:12
noticed (1)
    22:13
notified (3)
    28:9,10,12
notorious (1)
    16:23
Number (2)
    4:13;27:21

## O

Object (6)
    16:16,24;18:2;
    25:9;41:3;43:25
objections (1)
    4:18
observed (1)
    43:15
obstruction (1)
    42:24
obtain (4)
    7:16;8:8;9:7;12:16
obtained (1)
    39:17
occurred (4)
    14:22;35:24;36:1,4
off (4)
    5:25;13:16,24;
    28:12
offhand (2)

16:3;36:2
Officer (38)
    4:6,7,14;5:4;6:12,
    13,17;9:10;10:24,25;
    11:3,5,8,18;14:9;
    15:12,16;18:11,15;
    19:8,14,23,25;20:2;
    22:8;24:10,14;30:21;
    33:4,20;36:9;38:15,
    20;39:6;41:20,23;
    42:12;44:6
Officers (22)
    4:9;15:7,9,10;
    17:25;18:7;19:19,20;
    23:21;24:6;34:23;
    35:1;36:11,12,14,18,
    24;37:2,8,11,12;
    42:23
official (1)
    18:11,15;39:6
often (1)
    35:6
old (1)
    49:24
Once (1)
    33:16
one (8)
    10:1,9;12:10;15:6;
    17:4;26:21;46:3;50:2
ones (1)
    35:6
only (6)
    5:23;15:6;24:23;
    47:25;49:4;50:2
onto (1)
    41:24
open (1)
    31:8,9
opened (4)
    23:13,16;31:11,12
opening (1)
    23:18
operational (1)
    11:17
opportunity (1)
    20:11
order (1)
    25:23
ordinary (1)
    16:15
originally (2)
    32:6;37:12
others (2)
    16:23;17:2
out (4)
    10:18;16:14;40:8,
    11
outside (3)
    9:11;41:22;42:8
over (4)
    13:8;19:7;26:10;
    42:3
overlooking (1)

Case 1:16-cv-02539-MLB   Document 52   Filed 10/16/17   Page 61 of 63

Lacarsha Gay vs.
Cobb County, Georgia, et al.

OFFICER MATTHEW MADDEN
July 17, 2017

41:25
own (1)
30:19

**P**

paid (4)
10:25;11:1,4,4
parenting (2)
44:4,7
parent-in-laws (1)
46:19
parents (8)
40:2;45:8;46:7,9,
14,15;47:1;49:1
part (3)
28:12;40:7;41:13
parties (2)
23:7;24:19
partner (1)
35:14
party (1)
25:5
patrol (2)
33:2;34:18
patrolled (2)
14:9;16:22
patrolling (2)
10:14;16:5
patrolman (1)
6:23
pending (3)
4:11;5:24;46:1
people (7)
26:18;41:21,22;
42:6,8,11;45:22
performing (1)
10:21
Perimeter (3)
7:5;9:2,4
permitted (1)
4:17
person (3)
18:8;19:4;20:4
pertaining (2)
26:15;33:13
pertinent (2)
25:22,24
phase (1)
41:15
physical (5)
17:20,21,23,24;
25:5
Physically (2)
17:19;30:25
picking (1)
34:8
piece (1)
38:23
place (1)
50:10
placed (1)
33:2

places (2)
17:2,4
Plaintiff's (2)
20:25;21:14
platform (1)
41:25
please (2)
4:4;5:25
point (9)
19:25;25:7;26:7;
28:23;29:23;31:10;
36:21;41:10,14
Police (26)
4:9;6:12,13,17;
7:12,25;8:14;9:10;
10:23,25;11:3,5,8,18;
12:3,8,21,23;14:9;
17:25;18:7,11,15;
27:17;39:2,6
policies (2)
12:8;27:17
policing (1)
9:11
policy (5)
13:7,9,14,14;27:21
position (1)
42:3
possession (1)
50:10
possible (2)
19:17;38:25
Possibly (1)
38:16
POST (3)
7:17;11:7;16:7
POST-certified (1)
7:14
Practice (3)
4:17;25:4;43:22
precinct (7)
14:17,18,20;15:20,
21;16:1,21
premises (6)
10:14,15;27:22;
28:1;30:11;35:7
presence (1)
35:18
present (3)
19:19;32:24;40:20
prevented (1)
31:15
previous (1)
21:3
primary (3)
37:22,23,25
prior (11)
16:4;18:19,22;
26:23;27:1,17;29:12,
17,18;34:24;35:4
private (3)
27:22,25;28:1
probable (7)
29:7,10;32:11,12,

14;37:9,13
probably (2)
17:15;27:23
procedure (1)
13:10
procedures (5)
12:8,17,21,24;13:2
pronunciate (1)
48:13
propose (1)
4:18
provide (5)
25:24;26:9;28:23;
34:1;35:17
provided (2)
24:20;25:15
public (2)
20:5;39:5
pull (1)
46:4
pulled (2)
19:22;20:5
purpose (1)
39:2
purposes (1)
4:16
put (5)
29:23;30:2;31:11,
13,23
putting (1)
30:4

**Q**

quality (1)
8:7

**R**

read (10)
5:18;21:21;22:24;
28:13;33:16,17,19,
22;34:11;43:11
Reading (2)
22:5;34:15
really (3)
5:14;11:6;12:11
reason (1)
25:2
recall (28)
9:6;15:7,10;16:3;
17:22;18:6,9,19,21;
22:3;25:18,21;26:10;
27:3;28:18;29:21;
30:23;31:25;33:19;
34:15,16,19;35:1;
36:11;37:15;43:12;
44:2,14
receive (2)
12:23;36:17
received (4)
11:7;22:17;24:23;
25:1

recollection (1)
34:14
record (2)
6:1,4
recordings (1)
50:14
refer (1)
24:1
reflect (1)
38:7
refresh (1)
34:14
regard (2)
12:18;15:5
regarding (5)
39:5,17;41:15;
44:3;50:10
relating (1)
50:14
relationship (1)
46:5
relay (1)
43:10
relayed (1)
36:14
remember (17)
15:8,10,12,14;
18:13,16;19:24;20:3,
15,20,22,23;28:22,
25;29:4;31:1;44:5
Renz (3)
8:18,20,23
R-E-N-Z (1)
8:18
Repeat (4)
12:10;18:4,4;26:25
rephrase (1)
5:9
report (28)
9:17,17;12:16;
19:1;20:24;21:19;
22:4,5,5,7,10;24:2;
25:23;26:10;34:12,
16;36:20;38:7,9,12,
13,21,22,24;39:2,19;
41:17;43:11
reporter (8)
4:5;5:13;21:5,10,
11,13;22:22;23:1
reports (2)
39:1;50:13
represent (1)
5:5
represented (1)
4:14
request (1)
5:24
required (2)
43:21;44:12
reserved (1)
4:20
residence (10)
25:3;26:24;27:1,5,

7,10,14,25;34:10;
43:14
respond (1)
5:25
responded (3)
15:7;23:21;25:20
responding (2)
11:25;22:23
response (3)
5:10,16;23:2
responsible (5)
13:1,3,13,16;27:16
responsiveness (2)
4:19,19
restroom (1)
5:22
result (2)
32:18;43:2
Resuming (7)
16:17;21:17;24:3;
28:6;31:18;34:13;
41:5
review (1)
21:19
reviewed (1)
13:5
reviewing (2)
13:13;22:4
Richard (1)
48:19
right (25)
6:3,8,10;9:4,5;
16:3;22:24;23:11,13;
24:11;28:4;30:12;
31:13,16;36:2;37:12;
38:2;41:2,7;42:4,16;
46:16,24;49:2,9
rights (3)
33:17,19,22
risk (1)
17:25
Rockdale (2)
50:7,8
role (1)
16:2
roughly (1)
16:10
Ruby (1)
48:22

**S**

safety (2)
30:19,22
same (7)
14:11;15:19,21;
16:19;18:23;47:13;
49:1
saw (1)
22:21
scene (5)
19:3,18,20;21:23;
22:17;35:4,23

Case 1:16-cv-02539-MLB   Document 52   Filed 10/16/17   Page 62 of 63

Lacarsha Gay vs.
Cobb County, Georgia, et al.

OFFICER MATTHEW MADDEN
July 17, 2017

schedule (1)
    13:19
school (1)
    7:3
Science (1)
    9:8
scratches (1)
    22:11
seat-belted (1)
    34:17
section (2)
    18:23;32:16
sector (2)
    15:19;16:22
Security (2)
    10:12,13
seeing (1)
    20:3
seizing (1)
    30:5
sent (1)
    23:5
sequence (3)
    26:15;31:19;33:24
sequentially (1)
    21:1
Sergeant (6)
    4:10,10;9:19,23;
    10:3;15:14
sergeant's (1)
    9:23
serve (1)
    9:21
services (1)
    11:13
several (4)
    9:25;15:3;19:2,2
S-H-A (1)
    49:18
shift (3)
    14:1,3,6
shipping/receiving (1)
    8:7
show (1)
    19:11
sibling (1)
    47:25
sick (1)
    14:4
side (3)
    9:11;10:4,5
sign (2)
    13:5,8
significant (1)
    47:21
signing (2)
    13:16;28:12
Simple (1)
    37:20
sister- (1)
    46:7
sister-in-law (1)
    45:10

sisters (2)
    46:7;47:5
situation (3)
    18:6;35:3;43:18
situations (1)
    35:12
six (1)
    10:5
Snelling (18)
    4:15,22;5:22;
    16:16,24;18:2;21:1,4,
    8,12;24:1;25:9;
    27:25;28:2;31:17;
    34:11;41:3;43:25
somebody (1)
    26:1
someone (2)
    19:23;43:23
sometimes (4)
    21:10;35:11,11,15
Somewhat (1)
    42:5
sorry (2)
    4:10;24:4
sort (1)
    13:12
Sounds (1)
    9:6
southern (1)
    48:23
span (1)
    16:10
speak (3)
    20:18;43:5,8
speaking (2)
    7:13;14:11
specific (3)
    11:24;12:17,20
specifically (6)
    15:25;17:22;19:15;
    20:21;25:18;30:6
spell (3)
    45:6;48:13;49:15
spoke (3)
    20:19;24:13,14
start (1)
    6:20
started (2)
    9:2;29:12
starting (1)
    6:16
state (2)
    6:3;32:16
stated (6)
    26:12;34:4,5,6,8;
    38:5
statement (9)
    30:8,16;38:8,11,
    24;39:18,20,21;43:19
statements (1)
    37:24
States (2)
    9:21;40:4

statute (2)
    18:24;43:24
staying (1)
    35:22
still (3)
    25:3,5;32:1
struck (3)
    38:1;40:6,9
substance (1)
    22:3
sure (6)
    28:7;30:17;39:8,
    11,13;41:18
surrounded (1)
    33:25
surrounding (1)
    16:11
swear (2)
    4:3;40:11
swore (1)
    40:8
sworn (2)
    4:5;5:1

T

talk (3)
    5:22;20:11;25:13
talked (1)
    33:11
talking (3)
    14:24;29:6,9
tasks (1)
    10:21
ten (2)
    17:14,17
T-E-R (1)
    49:17
Teresa (2)
    49:14,17
testified (2)
    5:1;27:16
testimony (3)
    26:7;32:23;41:23
third (4)
    37:20;40:3,14,18
threat (1)
    18:7
threaten (5)
    29:1,2,3;30:24,25
three (8)
    8:12;13:25,25;
    14:17,18,20;15:18,22
threshold (1)
    31:7
times (3)
    11:1,5;15:1;35:16
today (6)
    4:13,14;5:6,13;
    16:4;50:15
together (2)
    33:6,7
told (3)

22:15;23:1;34:9
Tony (1)
    46:9
T-O-N-Y (1)
    46:10
took (2)
    11:21;50:10
traffic (4)
    11:12,13,14,21
training (6)
    11:9,24;12:2,12,
    13;39:1
transported (2)
    34:18,20
travel (1)
    12:14
true (2)
    30:8;35:15
try (1)
    33:14
trying (4)
    24:18;25:11;31:19;
    41:1
two (5)
    13:25,25,25,25;
    49:16
types (1)
    35:21

U

uh-uh (1)
    5:15
ultimately (5)
    40:2,25;41:6,8;
    44:10
unable (1)
    37:24
uncle (2)
    49:11,21
uncles (1)
    48:7
uncooperative (2)
    26:24;27:2
under (5)
    4:12,17;18:23;
    32:16;43:24
understood (2)
    5:10;13:6
undetermined (1)
    39:25
uniform (4)
    10:17,18,19;14:15
United (1)
    9:21
Unless (1)
    14:4
unusual (1)
    17:25
up (8)
    13:10;19:11,22;
    20:5;21:5,11;34:8;
    44:10

updated (1)
    13:14
upon (2)
    23:18;40:3
use (3)
    4:20;34:4,6
using (1)
    32:22
usually (1)
    35:10

V

Van (3)
    48:11,11,15
vehicle (2)
    34:4,6
verbal (1)
    5:16
Village (1)
    19:5
violence (4)
    12:15;17:21;40:19,
    20
violent (2)
    17:18,19

W

walked (2)
    25:12,14
wants (1)
    35:14
warehouse (1)
    8:6
warrant (5)
    27:9;40:8,10,11,14
way (1)
    17:13
welcome (1)
    5:23
Wells (2)
    15:16,25
Wells' (1)
    16:2
What's (3)
    13:19;19:13;39:2
whenever (1)
    13:9
Where'd (1)
    8:24
Whereupon (3)
    4:23;21:14;50:20
Who's (5)
    10:2,2;19:8,10,11,
    12
whose (2)
    26:2,2
wife (2)
    47:5;49:4
wife's (7)
    7:8;45:8,9,9;47:1;
    48:8,20

Lacarsha Gay vs.
Cobb County, Georgia, et al.

OFFICER MATTHEW MADDEN
July 17, 2017

within (1)
  46:3
witness (13)
  4:3,5,25;16:25;
  18:3;23:3;25:10;
  39:18;40:5,19;43:17,
  19;44:1
witnesses (2)
  26:18;43:5
work (9)
  7:25;8:1,7,21;10:4;
  13:19,20,21;14:6
worked (6)
  8:6,8,11,18;10:5;
  16:19
working (2)
  7:11,23
write (1)
  12:16
written (2)
  13:12;43:18
wrote (1)
  22:9

## Y

Y'all (1)
  21:11
y'all's (1)
  50:11
years (2)
  7:19;8:12

## 1

1 (1)
  20:25
1/18/1989 (1)
  6:7
1:16-CV-2539 (1)
  4:13
10:21 (1)
  4:2
11:29 (1)
  50:21
12-hour (3)
  13:20;14:1,3
16 (3)
  14:25;15:8;16:5

## 2

2007 (3)
  8:10,11,23
2009 (1)
  9:5
2010 (5)
  6:21;7:18,21;8:11;
  16:8
2014 (6)
  6:15;7:21;14:25;
  15:8;16:5,8
20-something (1)

49:25

## 3

3 (1)
  28:3

## 4

4 (1)
  21:15

## 5

5.07 (1)
  27:21

## 9

911 (4)
  26:19,20,21;43:16